INEXCO OIL COMPANY, Appellant
(Petitioner below),

v.

The OIL AND GAS CONSERVATION COMMISSION of the State of Wyoming et al., Appellees (Respondents below).

No. 3963.

Supreme Court of Wyoming.

Nov. 29, 1971.

Houston G. Williams, of Wehrli & Williams, Casper, Clyde O. Martz and Brian

T. Dolan, of Davis, Graham & Stubbs, Denver, Colo., for appellant.

William M. Sutton, Sp. Asst. Atty. Gen., Cheyenne, for Wyoming Oil and Gas Conservation Commission.

Before McINTYRE, C. J., and PARKER, McEWAN, and GRAY, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Following certain hearings of the Wyoming Oil and Gas Conservation Commission in 1969 and early 1970 to determine whether or not waste existed or was imminent in the Hilight-Jayson Field, which resulted in restrictive orders limiting Inexco's production of gas and oil, the company in July 1970 petitioned for modification of the commission's orders, challenging the commission's authority under the Oil and Gas Conservation Act, §§ 30–216—30–231, W.S.1957, C.1967, to so restrict production from Inexco's wells.

When the commission rendered its decision adverse to the application, appeal was taken to the district court under the Wyoming Administrative Procedure Act, §§ 9–276.19—9–276.33, W.S.1957 (1971 Cum. Supp.), and Rule 72.1, W.R.C.P. The district court denied the relief requested by Inexco, and in the cause here on appeal the petitioner urged that the commission lacked authority under Wyoming law to restrict oil and gas production to less than the wells could produce under sound engineering practices except when restricting pursuant to exception location wells and correlative rights and where necessary to prevent waste as defined in § 30–216.

Petitioner in its statement of the case, which is unchallenged by the commission, recites the following background of the controversy:

> The Hilight-Jayson Field in the South Powder River Basin was discovered by

Inexco in February 1969 and by July 1970 contained approximately 170 producing wells of which Inexco owned or operated 77, or about 45 percent, the operation being in accordance with sound engineering practices. It was an oil as distinguished from a gas field, and was estimated to have proven or probable reserves of 25.6 million barrels of oil and 133.8 billion cubic feet of gas. The reservoir had no free gas cap but received reservoir energy from gas in solution that was unavoidably and necessarily produced with the oil. Though somewhat variable the average of Inexco's gas-oil ratios was just over 907 cubic feet of gas per barrel of oil produced. Prior to June 1970 no facilities were available to process the solution gas and remove liquid hydrocarbons therefrom and except as gas could be used for the operation of equipment on leases it could not be stored, sold, saved, or used. Being found in solution and providing solution drive for production, its release in connection with oil production did not dissipate reservoir energy nor limit ultimate primary or secondary production, and it could not be used economically for pressure maintenance or secondary recovery operations. The gas that was unavoidably produced with oil and could not be processed by available facilities was flared by the producers.[1]

In 1969 when the solution gas reservoir characteristics and potentials were identified, Inexco commenced negotiations with certain gas processing and pipeline companies to procure a market through which the solution gas could be saved and used. On September 15, 1969, Inexco committed its reserves to the McCulloch Oil Corporation, which was to build a plant (initial plans called for a 20,000 mcf per day plant, later changed to 35,000, and finally to 65,000). Sixty

---

1. Evidence taken in the December 16, 1969, commission hearing indicated that approximately 30 million cubic feet of gas per day was being vented or flared in the field, and that a cumulative total of approximately 2 billion cubic feet of gas had been vented or flared from the date of discovery of the field.

of Inexco's 77 wells were connected to this plant by the date of the petition, July 1970. McCulloch signed contracts with seventeen producers for approximately 70 percent of the gas reserves in the field and offered contracts to the remaining twelve. Inexco in cooperation with McCulloch secured the commitment of Colorado Interstate Gas Company to build a line to the area which was certificated by the Federal Power Commission in June 1970 and was scheduled for completion in September 1970. The line was designed to accommodate 130,000 mcf of gas daily, an amount sufficient for all dry gas then and potentially generated at the McCulloch plant. From June 1970 until such time as gas pipeline connections were completed, dry gas residues from gas purchased and processed by McCulloch from Inexco's wells and not returned for use on its leases were flared by McCulloch at its plant, which flaring was necessary for the operation of the plant and the removal of liquids from the gas, no gas from connected wells being flared by Inexco or at its leases. Phillips Petroleum and Panhandle Eastern Pipeline made commitments for an additional processing plant and dry gas pipeline respectively and contracted for a substantial part of the field's gas not committed to McCulloch.

Inexco's July 1970 petition for modification sought to have the commission's orders altered (1) to remove oil allowables that restricted production to less than the wells could produce by sound conservation practices, (2) to exclude from restriction gas that was saved and used by sale and delivery to gas processing plants, and (3) to release from restriction gas that was unavoidably produced with oil and which could not be marketed or otherwise saved and used at the time it was produced.

Subsequent to the commission's adverse decision and the trial court's later denial of relief to Inexco and pending the appeal here, the forty-first session of the legislature amended and re-enacted §§ 30–216 and 30–229, whereupon the commission moved for the dismissal of the appeal, asserting that the changes and amendments rendered the issues moot and academic. This motion was opposed by Inexco, that company contending the amendments might fairly be construed to confirm, not negate, its position. While we agree that the issues presented are not now moot, we are also mindful of the effect which the amendments have on the controversy since as an aid to the interpretation of an ambiguous statute subsequent enactments by the legislature are entitled to consideration. Oregon Basin Oil & Gas Co. v. Ohio Oil Co., 70 Wyo. 263, 248 P.2d 198, 204; 2 Sutherland, Statutory Construction, § 5110 (3 ed.).

As a prelude to analysis of §§ 30–216 and 30–229, it is interesting to note that as the latter stood before the 1969 and 1971 amendments some authorities had claimed it contradicted the rest of the Act.[2] Originally the statute read:

"It is not the intent or purpose of this law [§§ 30–216 to 30–231] to require the proration or distribution of the production of oil and gas among the fields of Wyoming on the basis of market demand. This act [§§ 30–216 to 30–231] shall never be construed to require, permit or authorize the commission, the supervisor, or any court to make, enter or enforce any order, rule, regulation or judgment requiring restriction of production of any pool or of any well (except a well or wells drilled in violation of section 3 hereof [§ 30–221 [3]]) to an amount less than the well or pool can produce in accordance with sound engineering practice."

---

2. 13 Wyo.L.J. 1, 7.

3. This statute permitted the commission when required to protect correlative rights

or to prevent or to assist in preventing waste to establish drilling units of specified and approximately uniform shape covering any pool.

In 1969 it was amended by substituting in the first sentence thereof the phrase "permit, or authorize the commission or supervisor to prorate or distribute" for "the proration or distribution of" and for the parenthetical portion of the second sentence the limitation "except as provided in subsection (d) (4) of section 30–219 * * *."[4] In 1971 the concluding portion of § 30–229 reading, "except as provided in subsection (d) (4) of section 30–219 * * * as amended by this act to an amount less than the well or pool can produce in accordance with sound engineering practice," was stricken and substituted therefor was the phrase "except to prevent waste and to protect correlative rights." Thus, whatever questions might previously have been raised, the 1971 amendment made it clear that in order to prevent waste conservation measures were permissible.

Turning then to the matter of what constitutes "waste," we first observe the exception stated in the penultimate sentence of § 30–216(a) (1), prior to the amendment in 1971, which we consider to have been of pertinence to the issues here: "gas unavoidably produced with oil if it is not economically feasible for the producer to save or use such gas [is excepted from the term 'waste']." These words standing alone could possibly be interpreted as meaning no more than the legislature's intention to prescribe that it is not waste if a small isolated oil well produces gas in such an amount that it would never be feasible to save and use it. However, in the light of the entire Act the trial court's conclusion

here that it *was* economically feasible for Inexco to save or use the gas[5] has merit.

■ From the first, the thrust of Inexco's argument has been that the regulatory authority of the commission is limited to the prevention of waste as defined in § 30–216(a) and restrictions necessary to avoid impairment of correlative rights (§ 30–216(i)) as a consequence of regulatory action (§ 30–219(d) (4)) and that the authority to regulate oil and gas production in the broad interest of conservation or otherwise was expressly denied to the commission (§ 30–229). Under a literal interpretation of the latter statute we would not say that the position of the company throughout the controversy has been without merit. However, under the legislature's clarification of the previously ambiguous statutes, the bases for Inexco's argument have been substantially altered. Important in such clarification are the statements now defining waste as the "excessive * * * use, or the unnecessary dissipation of, reservoir energy" (§ 30–216(a) (1) (2)) and the "producing of any oil or gas well in a manner that causes, or tends to cause, reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations, or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas" (§ 30–216(a) (1) (4)). Even so, the legislature in 1971 also added a new element now found in the final clause of § 30–216(a) (1) (5):

"[Waste means and includes:] The production of oil or gas in excess of (a) transportation or storage facilities; (b)

---

4. This subsection allowed the commission when required, in order to protect correlative rights, to restrict or limit the production of oil and gas from any well which was allowed, after the effective date of the act, as an exception to the location requirements of or as an additional well permitted under any order of the commission establishing drilling units for a pool or part thereof or of any general well spacing rule or order adopted by the commission for conservation purposes.

5. On this aspect, the trial court remarked: "Witness the processing plants and pipelines that have been constructed and are being constructed to do this very thing! That there might be some delay in connecting the wells to these facilities is of small moment when the ultimate recovery is not affected. At this instant, perhaps a hookup without restriction is not possible but this seems little excuse to waste this valuable resource in the meantime."

the amount reasonably required to be produced in the proper drilling, completing, or testing of the well from which it is produced, or oil or gas otherwise usefully utilized: *Except gas produced from an oil well pending the time when with reasonable diligence the gas can be sold or otherwise usefully utilized on terms and conditions that are just and reasonable.*" (Emphasis supplied.)

Had this provision existed at the time of the 1969 and 1970 hearings it would have been necessary that the commission in order to justify the issued orders find that reasonable diligence had not been exercised as to the sale or utilization of gas on reasonable and just terms and conditions. It follows that such foundation should be a requisite to the effectuation of the orders which have been entered. It is, therefore, ordered that the judgment of the trial court be affirmed, subject to the right of Inexco at its option to require a hearing before the commission on the mentioned aspect.

Affirmed.