**GULF OIL CORPORATION, Petitioner,**

v.

**WYOMING OIL AND GAS CONSERVATION COMMISSION and Story Oil Impact Committee, Respondents.**

No. 84–82.

Supreme Court of Wyoming.

Jan. 4, 1985.

Houston G. Williams and Richard L. Williams of Williams, Porter, Day & Neville, P.C., Casper, and Michael C. Smith, Houston, Tex., for petitioner.

Joe Scott, Sp. Asst. Atty. Gen., Casper, for respondent Wyo. Oil and Gas Conservation Com'n.

Rebecca W. Thomson of Burgess & Davis, Sheridan, for respondent Story Oil Impact Committee.

Before THOMAS*, C.J., and ROSE, ROONEY **, BROWN and CARDINE, JJ.

ROSE, Justice.

This petition for review concerns the authority of the respondent Wyoming Oil and Gas Conservation Commission (Commission or WOGCC) to impose certain restrictions on the drilling activities of petitioner Gulf Oil Corporation (Gulf) on federal land within this state. The Commission granted Gulf's application for a permit to drill a well on national forest land, subject to the condition that Gulf refrain from using its preferred access route through the village of Story, Wyoming. At issue is whether federal mining and environmental protection laws[1] preempt this state's statutes and rules[2] which allow the Commission to condition federally authorized drilling activities on the basis of identified environmental concerns. Gulf also asserts that, the federal preemption question aside, the Commission's order in this case is not supported by substantial evidence. We will affirm.

## FACTS

In compliance with state and federal regulations Gulf sought permission from both WOGCC and the United States Department of the Interior, Bureau of Land Management (BLM) to drill a wildcat well[3] in the Granite Ridge Field of Sheridan County. The proposed well concerns federally owned minerals in the Big Horn National Forest and is one of several exploratory drillings planned by Gulf in this field. Gulf proposed to obtain access to the well site via state highway and county road through Story. This proposed access, designated the southern route, would require extending the existing county road west of Story for about 3.8 miles over national forest land and property owned jointly by Gulf and Texaco, Inc.

Respondent Story Oil Impact Committee (STOIC), composed of citizens of Story, filed a protest with WOGCC concerning the environmental consequences of Gulf's proposed well and access route. STOIC contended that the drilling and related activities would violate Rule 326 (Chapter III, Section 26) of the Rules and Regulations of the Wyoming Oil and Gas Conservation Commission, which provides in part:

"The owner shall not pollute streams, underground water, or unreasonably damage the surface of the leased premises or other lands."[4]

The Commission, on its own motion, also raised the matter of Gulf's compliance with Rule 326, and a hearing was held on November 15, 1983.

The testimony and other evidence presented at the hearing focused on the feasibility and environmental impact of various means of reaching the well site. Representatives from Gulf testified concerning five alternative means of access:

1. The proposed southern access road through Story;

* Became Chief Justice January 1, 1985.

** Chief Justice at time of oral argument.

1. The Mineral Lands Leasing Act of 1920, 30 U.S.C. § 181 et seq.; the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.; and the Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371 et seq.

2. Sections 30–5–101 through 30–5–126, W.S. 1977, and rules promulgated by WOGCC pursuant to § 30–5–104(c), W.S.1977.

3. A wildcat oil well is a well in an area not known to be productive. Environmental Assessment for the Proposed Gulf's Granite Ridge 1–15–1D Oil and Gas Exploration Well, United States Department of the Interior, Bureau of Land Management, p. 1.

4. As authority for the promulgation of this rule, WOGCC cites § 30–5–104(d)(ii), W.S.1977, which provides:

"(d) The commission has authority:

\* \* \* \* \* \*

"(ii) To regulate, for conservation purposes:
"(A) The drilling, producing, and plugging of wells;
"(B) The shooting and chemical treatment of wells;
"(C) The spacing of wells;
"(D) Disposal of salt water, nonpotable water, and oil-field wastes;
"(E) The contamination or waste of underground water."

2. The northern access route—an extension of roadway from Gulf's existing well site on private property across national forest land, part of which is subject to Roadless Area Review and Evaluation (RARE II) by the United States Department of Agriculture, Forest Service;

3. The North Piney Creek route which would require the improvement of an existing county bridge;

4. Directional drilling from private property; and

5. Helicopter mobilization.

STOIC offered and the Commission received into evidence the Environmental Assessment of the proposed well prepared by the BLM with technical assistance from the United States Forest Service.[5] The Commission took notice of the ramifications of the RARE II program, pursuant to § 16–3–108(d), W.S.1977, of the Wyoming Administrative Procedure Act.[6]

After considering the evidence presented at the hearing, WOGCC, on November 23, 1983, issued its findings of fact and conclusions of law. Findings 9 through 12 describe the consequences of using the proposed southern road:

"9. * * * [The southern road] will go from an elevation of about 5,250 feet to 6,960 feet in a little over two air miles and about 3.8 road miles. To state the obvious, it will be a very steep grade.

"10. Much of this road goes along a limestone cliff. There is a minimal amount of vegetation on it now and there is not likely to be more in the future. About 700 feet of this will be visible from 80 percent of Story, and an additional 1,000 feet of road will be visible from various points in the area. Much would be visible from Interstate Highway 90.

"11. The road will also run close to the Story Penrose Trail, as shown on Gulf Exhibit 2. This trail is a major access route for recreational purposes (hiking, birdwatching, hunting, and fishing) to various lakes, creeks, and the Cloud Peak Primitive Area in the Big Horn National Forest.

"12. Due to the extreme grade of the road and its crossing of the limestone cliff, it will be impossible to reclaim a considerable portion of the road. Some parts will be a permanent scar on the landscape."

Finding 21 sets out the problems associated with the alternate, northern route:

"21. * * * Much of this route is a private road through the land of an individual named Burns, or land owned by a corporation owned by Burns. As part of the arrangement to be able to use this route to [Gulf's existing well site], Gulf promised Burns that it would not extend this road into the nearby Big Horn National Forest. This road does cross some

5. The Environmental Assessment was prepared under the authority of 42 U.S.C. § 4332(2)(c) of the National Environmental Policy Act:

"The Congress authorizes and directs that, to the fullest extent possible: * * * (2) all agencies of the Federal Government shall—

> * * * * * *

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

6. Section 16–3–108(d), W.S.1977, provides:

"(d) Notice may be taken of judicially cognizable facts. In addition notice may be taken of technical or scientific facts within the agency's specialized knowledge or information, data and material included within the agency's files. The parties shall be notified either before or during the hearing or after the hearing but before the agency decision of material facts noticed, and they shall be afforded an opportunity to contest the facts noticed."

National Forest land and some land under the RARE II designation after leaving Burns' property. Though Gulf has the power of condemnation for an access road to an oil well, it has orally promised Burns it would not use condemnation against him."

Obstacles also exist with respect to the North Piney Creek route, as indicated in Finding 20:

"20. Another alternative access would involve going along and crossing North Piney Creek. To do so, Gulf would have to improve a bridge across the creek to accommodate heavy truck traffic. The Sheridan County Commission has denied them permission to do so."

The Commission recognized the impossibility of directional drilling through 10,000 feet of granite (Finding 23), but found that Gulf had not ruled out the feasibility. of helicopter mobilization as a means of access:

"19. Gulf objected to helicopter mobilization to drill the [proposed] well * * * because it was too expensive, too much equipment had to be moved, and it would be hazardous to carry explosives on the helicopters. The Bureau of Land Management (BLM), in their Environmental Assessment (EA) concluded that helicopter mobilization would have the least effect on the environment of any alternative. We make no finding of this nature. We do find that helicopter mobilization would not require building the southern access road with the resultant permanent scar on the mountain. The evidence does not reflect how expensive helicopter mobilization would be, the nature and amount of equipment that would have to be moved, the reason for having explosives on them, or how many trips with explosives would occur. ´We are not persuaded that helicopter mobilization is not a viable, technologically feasible, and appropriate means of access to the [proposed] well."

The Commission concluded that the proposed southern access road to the drill site would leave a nonreclaimable scar on the side of the mountain and, therefore, constituted unreasonable land surface damage. The Commission further concluded that Gulf had failed to prove a lack of any reasonable alternative to the southern road:

"It appears there are other feasible alternatives discussed in the Environmental Assessment. We prefer to let the Bureau of Land Management, the Forest Service, and Gulf consider these alternatives in the future. Before a permit would be granted for a route that would cause surface damage such as the southern route, the owner must prove to this Commission that there is no reasonable alternative. Gulf has failed to meet this burden of proof."

Accordingly, WOGCC approved Gulf's application for a permit to drill the well, subject to the condition that access be obtained by means other than the proposed southern route.

Gulf timely filed a petition for judicial review of the Commission's order. The district court certified the case to this court pursuant to Rule 12.09, W.R.A.P. Additional facts pertinent to this case will be developed during our discussion of the issues.

## ISSUES

Gulf presents the following issues for our consideration:

"I. Are the actions of the Wyoming Oil and Gas Conservation Commission in imposing conditions on a state permit to drill on federal surface to federal minerals pre-empted by the Supremacy Clause of the United States Constitution?

"II. Does the Wyoming Oil and Gas Conservation Commission lack jurisdiction to impose any restrictions with respect to that portion of the proposed access road which lies on the fee property owned by Gulf Oil Corporation and its partner?

"III. If the jurisdiction of the Wyoming Oil and Gas Conservation Commission has not been pre-empted under the Supremacy Clause of the United States

Constitution, was its order in this matter arbitrary, capricious, and not supported by substantial evidence?"

Before addressing these issues, we must dispose of respondents' contention that this case should be dismissed as moot.

### JUSTICIABILITY

In their briefs, the Commission and STOIC call to our attention factual matters which have developed since the administrative hearing and which, respondents urge, render this petition moot. On March 16, 1984, the BLM approved Gulf's application for a federal permit to drill its proposed well, subject to the condition that access be achieved by the northern route. The permit expressly stipulates that Gulf not reach the drilling site through the village of Story. Gulf did not appeal this decision and the time for filing an appeal has elapsed.[7] Therefore, respondents urge, Gulf must use the northern access route under the federal permit, and no decision by this court can alter that situation.

As an additional reason for considering this petition moot, respondents note that an initial exploratory well drilled by Gulf in the Granite Ridge Field resulted in a dry hole. Based on this information, respondents postulate that Gulf no longer intends to drill the well at issue in this case. By maintaining its petition, Gulf seeks an impermissible advisory opinion from this court, respondents contend.

■ We have often repeated the universal rule that a reviewing court will dismiss a case when, pending appeal, an event occurs which renders a cause moot and makes a determination of the issues unnecessary. *Northern Utilities, Inc. v. Public Service Commission of Wyoming,* Wyo., 620 P.2d 139, 140 (1980); *State ex rel. Schwartz v. Jones,* 61 Wyo. 350, 157 P.2d

993, 995 (1945). Appellate courts will not hand down decisions which cannot be given effect or which pertain to matters that may arise in the future. *Northern Utilities, Inc. v. Public Service Commission of Wyoming,* Wyo., 617 P.2d 1079, 1085 (1980); *Belondon v. State ex rel. Leimback,* Wyo., 379 P.2d 828, 829 (1963).

In determining whether events subsequent to the Commission's order render this case moot, we will examine all such events called to our attention by the parties to this petition. With respect to respondents' assertion that the federal permit irreversibly commits Gulf to the northern access route, we note that the BLM recently granted Gulf a 14-month suspension of operating and producing requirements under its lease agreement.[8] The BLM approved this relief based on Gulf's contention that no reasonable access exists to its proposed well site, other than through Story. This tolling of Gulf's obligations to drill, as a result of perceived access problems, would be futile if the access route designated in the permit could not be changed.

■ Without an exhaustive examination of the authority for the BLM's continuing jurisdiction and control over Gulf's mineral exploration on federal land, we note that 30 U.S.C. § 226(j) permits the modification of drilling requirements under leases committed, as here, to unit plans of development:[9]

"(j) For the purpose of more properly conserving the natural resources of any oil or gas pool, field, or like area, or any part thereof (whether or not any part of said oil or gas pool, field, or like area, is then subject to any cooperative or unit plan of development or operation), lessees thereof and their representatives may unite with each other, or jointly or separately with others, in collectively

---

7. A party aggrieved by a decision of the Bureau of Land Management has 30 days in which to seek an administrative appeal, 43 C.F.R. § 4.701, and 90 days from the final administrative decision in which to petition for judicial review, 30 U.S.C. § 226–2.

8. Regulations promulgated by the Department of the Interior provide for relief from production or operating requirements in federal leases. 43 C.F.R. § 3103.4–2.

9. Gulf's federal application for a permit to drill specifies that the proposed well site is subject to the Granite Ridge Unit Agreement.

adopting and operating under a cooperative or unit plan of development or operation of such pool, field, or like area, or any part thereof, whenever determined and certified by the Secretary of the Interior to be necessary or advisable in the public interest. *The Secretary is thereunto authorized, in his discretion, with the consent of the holders of leases involved, to establish, alter, change, or revoke drilling, producing, rental, minimum royalty, and royalty requirements of such leases and to make such regulations with reference to such leases, with the consent on the part of the lessees, in connection with the institution and operation of any such cooperative or unit plan as he may deem necessary or proper to secure the proper protection of the public interest.* * * * *" (Emphasis added.)

Thus, we cannot accept respondents' contention that Gulf no longer has recourse to the federal government for purposes of modifying the access requirements specified in the permit issued by the BLM.

■ As for respondents' hypothesis that an initial dry hole determines further exploration in the area, no evidence before this court establishes that Gulf has withdrawn its application for the required state permit or otherwise abandoned its plans to drill the proposed well. We will not speculate as to the effect of initial exploratory operations on Gulf's decision-making process, but must assume that Gulf intends to pursue the drilling program outlined in its permit application.

We conclude that a decision by this court concerning the authority of WOGCC to proscribe the use of a particular access road will directly affect Gulf's rights and course of action with respect to its proposed drilling activities. Having determined that this cause is not moot, we turn to a consideration of the issues raised by petitioner.

## FEDERAL PREEMPTION

The United States Supreme Court recently reviewed the two general ways in which state law can be preempted by federal enactments:

" * * * If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. [*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983) ]; *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* supra, [461 U.S.] at 190, 103 S.Ct., at 1722." *Silkwood v. Kerr-McGee Corporation,* — U.S. —, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).

Gulf contends that the WOGCC order based on Rule 326, supra, is invalid under either analysis.

■ Gulf takes the position that federal regulation of the environmental consequences of its proposed well and access route is extensive and, therefore, exclusive. Since federally owned minerals are involved, the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 181 et seq., and associated regulations promulgated by the Secretary of the Interior, 43 C.F.R. Part 3100, govern Gulf's activities. The United States Forest Service, Department of Agriculture, has jurisdiction over any surface disturbance caused by Gulf's drilling activities and road construction on national forest land. 16 U.S.C. §§ 478 and 551; 36 C.F.R.

Part 228. Further, the National Environmental Policy Act of 1969 mandates that all federal laws and regulations be interpreted and administered in accordance with the policy of environmental protection. 42 U.S.C. § 4332. See *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 222 A.D.C. 228, 685 F.2d 678 (D.C.Cir.1982). This comprehensive scheme of federal regulation leaves no room for the states to regulate the environmental effects of drilling activities on federal property, Gulf urges.

■ Our examination of the federal legislation cited by Gulf compels a contrary conclusion. We find that Congress, far from excluding state participation, has prescribed a significant role for local governments in the regulation of the environmental impact of mineral development on federal land.

■ We note at the outset that a state retains jurisdiction over national forest land within its boundaries and that the state is free to enforce its criminal and civil laws on that land. *Kleppe v. New Mexico*, 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34, reh. denied 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154 (1976). State police power extends over the public domain unless preempted by federal legislation enacted pursuant to the property clause.[10] *Kleppe v. New Mexico, supra*.

Two specific provisions in the Mineral Lands Leasing Act, 30 U.S.C. §§ 187 and 189, indicate an absence of congressional intent to assert exclusive control over federal lands leased for mineral development. Section 187 provides in pertinent part:

"* * * Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property * * *. None of such provisions shall be in conflict with the laws of the State in which the leased property is situated."

Section 189 protects the traditional rights of the states over federal land:

"* * * Nothing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States."

The Tenth Circuit Court of Appeals relied upon these provisions in *Texas Oil & Gas Corp. v. Phillips Petroleum Company*, 406 F.2d 1303 (10th Cir.1969), cert. denied 396 U.S. 829, 90 S.Ct. 80, 24 L.Ed.2d 80, in upholding well spacing and forced pooling orders issued to federal lessees by the Oklahoma Corporation Commission. The court concluded that the act itself refuted the lessees' argument that the federal government, by statutes and regulations, had effectively asserted exclusive jurisdiction to regulate the exploration, development, and conservation of federal lands for oil and gas.

Gulf contends that the myriad administrative regulations respecting the development of minerals on public property support its claim of exclusive federal jurisdiction over the matter. However, these regulations emphasize the viability of pertinent state rules. The Department of Interior requires that:

"All operations * * * shall be conducted to prevent unnecessary or undue degradation of the Federal lands and shall comply with all pertinent Federal and State laws * * *." 43 C.F.R. § 3809.2–2.

The Department of Agriculture specifies that compliance with state mining laws can satisfy the federal requirement that all mining activities be conducted so as to minimize adverse environmental activities on national forest land. 36 C.F.R. § 228.8(h).

■ The National Environmental Policy Act of 1969, supra, and the Environmental Quality Improvement Act of 1970, 42

10. The second clause of Art. IV, § 3 of the United States Constitution provides:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *."

U.S.C. § 4371 et seq., expressly designate state and local governments as the principal protectors of environmental values. Section 4371(b)(1) and (2) provides:

"(b)(1) The Congress declares that there is a national policy for the environment which provides for the enhancement of environmental quality. This policy is evidenced by statutes heretofore enacted relating to the prevention, abatement, and control of environmental pollution, water and land resources, transportation, and economic and regional development.

"(2) The primary responsibility for implementing this policy rests with State and local governments."

This policy governs the interpretation and administration of all laws of the United States including the Mineral Lands Leasing Act, 42 U.S.C. § 4332.

The Idaho Supreme Court in *State ex rel. Andrus v. Click*, 97 Idaho 791, 554 P.2d 969 (1976), referred to the states' role in the national scheme of environmental protection and concluded that federal mining laws did not preempt Idaho's Dredge Mining Act. Holders of federal mining claims in that case were operating on national forest land without the permit required by the state act. The state agency could deny a permit for environmental, recreational, economic, or other pertinent reasons. 554 P.2d at 974. The Idaho court upheld this local effort to control the environmental aspects of mineral development on federal lands:

"We also fail to find preemptive qualities in the nature of the subject matter regulated. * * * Indeed, the preservation of the environmental quality of its lands is a subject particularly suited to administration by the states. Congress has recognized that even where extensive federal environmental legislation exists, the primary responsibility for implementing environmental policy rests with state and local governments. 42 U.S.C. § 4371(b)(2); see also 42 U.S.C. § 4331(a)." 554 P.2d at 976.

The Oregon Court of Appeals approved this reasoning in *State ex rel. Cox v. Hibbard*, 31 Or.App. 269, 570 P.2d 1190 (1977), rejecting a federal preemption challenge of that state's environmental regulation of mining activities on the public domain.

We have found no cases striking down state regulations on the ground that Congress by enacting mining and environmental protection laws intended to occupy the field of environmental regulation of mineral development on federal land. This situation stands in sharp contrast to that encountered in Industrial Siting Council of the *State of Wyoming v. Chicago and North Western Transportation Company*, Wyo., 660 P.2d 776 (1983). There we noted that a number of courts had invalidated state attempts to regulate interstate common carriers as plainly inconsistent with the comprehensive federal regulatory scheme reflected in the Interstate Commerce Act, 49 U.S.C. § 10901. In that case, we overturned a state permit requirement for interstate railroad construction, concluding that Congress, in granting the Interstate Commerce Commission pervasive authority over interstate carriers, had intended to abolish multiple regulation. Since neither the Mineral Lands Leasing Act nor the National Environmental Policy Act reflects a pervasive regulatory scheme or an intent to abolish state influence over mining activities on federal property, we conclude that WOGCC Rule 326, supra, does not infringe an area dominated by the federal government.

Our finding that Congress has evidenced no intent to assert exclusive control over the environmental impact of mineral development on federal property does not end our inquiry. Rule 326, supra, is still preempted if it actually conflicts with federal law. Gulf cites two principal cases in which the courts have invalidated local regulation of mineral development on this basis: *Ventura County v. Gulf Oil Corporation*, 601 F.2d 1080 (9th Cir.1979), aff'd 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980), and *Brubaker v. Board of County Commissioners*, El Paso County, Colo., 652 P.2d 1050 (1982).

The courts in both of these cases concluded that the local regulations at issue *prohibited* an activity authorized by Congress. In *Ventura County*, the local government sought to enjoin the federal government's lessee from drilling for oil in the national forest without obtaining an open space use permit in compliance with local zoning ordinances. The Ninth Circuit Court of Appeals held that the permit requirement impermissibly conflicted with the Mineral Lands Leasing Act and, therefore, could not be applied to the appellee, Gulf Oil Corporation:

" * * * Ventura seeks to prohibit further activity by Gulf until it secures an Open Space Use Permit which may be issued on whatever conditions Ventura determines appropriate, or which may never be issued at all. The federal Government has authorized a specific use of federal lands, and Ventura cannot prohibit that use, either temporarily or permanently, in an attempt to substitute its judgment for that of Congress." 601 F.2d at 1084.

In *Brubaker v. Board of County Commissioners, El Paso County*, supra, the county board had denied appellants a permit to mine on federal land because the proposed operations were inconsistent with the county's long-range plans and incompatible with uses on surrounding properties. The Colorado Supreme Court held that the board's action could not stand, as it obstructed the purposes and objectives of Congress:

" * * * The Board seeks not merely to supplement the federal scheme, but to prohibit the very activities contemplated and authorized by federal law. Such a veto power is not consistent with the Supremacy Clause." 652 P.2d at 1056.

In contrast to the zoning ordinances at issue in *Ventura County* and *Brubaker*, mining permit requirements designed to safeguard the environment have received favorable treatment in the courts. These latter regulations constitute legitimate means of guiding mineral development without prohibiting it.

"It is established that state or local regulation supplementing the mining laws is permissible. [Citations.] State and local laws that merely impose reasonable conditions upon the use of federal lands may be enforceable, particularly where they are directed to environmental protection concerns. [Citations.]" *Brubaker v. Board of County Commissioners*, supra, 652 P.2d at 1059.

In *State ex rel. Andrus v. Click*, supra, 554 P.2d at 974–975, the Idaho Supreme Court held that the state's Dredge Mining Act did not conflict with federal mining laws merely because the state act imposed more stringent requirements for protecting environmental values on federal property:

"Where there is a direct collision between state and federal legislation our task is simple, the federal legislation would preempt state legislation by reason of the supremacy clause, United States Const. art. VI, clause 2; [citation]. However, state regulation which is more stringent than that under the federal legislation is not the type of conflicting legislation described by this standard. See e.g., *Northern States Power Co. v. Minnesota*, 447 F.2d 1143 (8th Cir.1971) (involving Minnesota pollution control requirements substantially more stringent than federal regulations). That is, the mere fact that federal legislation sets low standards of compliance does not imply that the federal legislation grants a right to an absence of further regulation. On the other hand, where a right is granted by the federal legislation, state regulation which rendered it impossible to exercise that right would be in conflict.

"We find no such conflict is presented by the provisions of the Idaho Act requiring a permit or the restoration of the land. Neither the requirement of obtaining a permit [n]or of restoring the land render it impossible to exercise rights specifically granted by the federal legislation, although they may make it more difficult."

The Idaho court rejected the argument that the state permit requirement interfered

with the congressional objective of encouraging the development of valuable mineral deposits. The court noted that federal mining and environmental protection laws evidence an intent to minimize wherever possible the adverse effects of mineral development on environmental quality. Idaho's Dredge Mining Act harmonizes with this goal and, therefore, applies to operators on federal land in the state. 554 P.2d at 977.

Similarly, the Oregon Court of Appeals in *State ex rel. Cox v. Hibbard,* supra, found no conflict between state environmental regulations and federal mining laws. The court distinguished *Ventura County v. Gulf Oil Corporation,* supra:

" * * * There the county by its zoning ordinance was attempting to prohibit Gulf Oil from conducting any and all oil exploration and extraction activities. Requiring the holder of a permit to mine on federal lands to obtain a permit under a state environmental protection law as in the case at bar is not the same as the banning of all mining activity as was the case in Ventura. [Citation.]" 570 P.2d at 1195.

*Granite Rock Company v. California Coastal Commission,* 590 F.Supp. 1361 (N.D.Cal.1984), is a recent federal court decision finding no impermissible conflict between state mining requirements and either federal mining laws or forest service regulations. The court reasoned that the state's attempts to manage the environmental consequences of private mining on federal land did not amount to the " 'local veto power,' " 590 F.Supp. at 1372, invalidated in *Ventura County v. Gulf Oil Corporation,* supra. The court refused to assume that the California commission would apply state permit requirements so as to render impossible the exercise of the applicant's rights under federal mining laws. Should that situation occur, the aggrieved party could seek to enjoin the enforcement of state regulations. The court noted the analogous objectives of the federal and state environmental regulations and concluded that compliance with state permit requirements did not prevent compliance with federal requirements.

The reasoning in these cases concerning local environmental regulation applies to the restrictions imposed on Gulf by WOGCC pursuant to Rule 326, supra. The Commission has neither prohibited mineral development authorized by Congress nor mandated the use of a particular means of access. Instead, the Commission has granted Gulf a conditional permit to drill, based on its dual findings that the southern route inflicts unreasonable surface damage and feasible alternatives apparently exist. This action by WOGCC under Rule 326 implements the national policy of environmental protection by assuring that mineral development on federal property will be conducted so as to minimize the harm to surface resources.

In summary, we find no intent by Congress to exclude states from regulating mining activities on federal land so as to safeguard environmental values. Neither do we find a direct conflict between Rule 326 and federal laws or objectives. We hold, therefore, that federal mining and environmental protection laws do not preempt WOGCC Rule 326, supra, or the enabling statute, § 30–5–104(d)(ii), supra n. 4. These state enactments provide valid authority for the Commission to condition Gulf's permit to drill on national forest land for federally owned minerals.

## JURISDICTION OVER PRIVATE PROPERTY

Gulf contends that WOGCC lacks jurisdiction to prohibit the construction of an access road across fee property owned by Gulf and Texaco. However, Gulf cites no authority and presents no argument in support of this position.

Rule 5.01, W.R.A.P., requires the brief of an appellant to contain reasons and citations to appropriate authorities in support of all contentions:

"The brief of the appellant shall contain under appropriate headings * * * :

* * * * * *

"(4) An argument. The argument may be preceded by a summary. The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on * * *."

We have invoked Rule 5.01(4) in the past and refused to consider issues inadequately presented for review. *Zanetti v. Zanetti,* Wyo., 689 P.2d 1116, 1122 (1984); *Knadler v. Adams,* Wyo., 661 P.2d 1052, 1054 (1983). Accordingly, we will not review this issue raised by Gulf without cogent argument and without proper citation. We merely note in passing that § 30-5-104(a), W.S.1977, confers jurisdiction upon WOGCC over private property and persons.[11]

SUBSTANTIAL EVIDENCE TO SUPPORT THE COMMISSION'S ORDER

The Commission ordered Gulf to refrain from using the proposed southern road based on the conclusion that Gulf had failed to prove an absence of reasonable alternatives:

"* * * Before a permit would be granted for a route that would cause surface damage such as the southern route, the owner must prove to this Commission that there is no reasonable alternative. Gulf has failed to meet this burden of proof."

Gulf contends that no substantial evidence exists in the record to support the Commission's conclusion and that the Commission's action is arbitrary and capricious.

 We note at the outset that Gulf, as an applicant for a permit to drill, bore the burden of proving to the Commission that its drilling operations would conform to the requirements of law. See *Chicago & Northwestern Railway Company v. Pub-*

*lic Service Commission of Wyoming,* Wyo., 334 P.2d 519 (1959). Specifically, Gulf had to establish that its proposed activities would not cause the unreasonable surface damage prohibited by Rule 326, supra. Gulf recognizes the environmental degradation inherent in the southern road but argues that the uncontradicted evidence establishes the absence of any reasonable alternative to this harm. We do not agree.

 Our obligations in reviewing an administrative action following a hearing are well settled. We are bound to uphold an agency's decision which is supported by substantial evidence contained in the entire record. Section 16-3-114(c)(ii)(E), W.S. 1977;[12] *Mountain Fuel Supply v. Wyoming Public Service Commission,* Wyo., 662 P.2d 878, 882 (1983); *Wyoming State Department of Education v. Barber,* Wyo., 649 P.2d 681, 689 (1982). We have defined substantial evidence to mean such evidence as a reasonable mind might accept as adequate to support a conclusion. *Board of Trustees, Laramie County School District No. 1 v. Spiegel,* Wyo., 549 P.2d 1161 (1976). Such evidence may be less than the weight of all the evidence, although it is more than a scintilla or suspicion of a fact. *Board of Trustees, Laramie County School District No. 1 v. Spiegel,* supra, 549 P.2d at 1178. If substantial evidence supports a finding, the agency, in light of the expertise and experience of its members, appropriately determines the ultimate weight assigned to such evidence. *Mountain Fuel Supply v. Wyoming Public Service Commission,* supra, 662 P.2d at 883.

The record in the instant case establishes that WOGCC considered various alternatives to the proposed southern route, in-

11. Section 30-5-104(a), W.S.1977, provides:
 "(a) The Wyoming oil and gas conservation commission * * * has jurisdiction and authority over all persons and property, public and private, necessary to effectuate the purposes and intent of this act."

12. Section 16-3-114(c)(ii)(E), W.S.1977 reads:
 "(c) * * * The reviewing court shall:

 * * * * * *

 "(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

 * * * * * *

 "(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

cluding helicopter mobilization, a northern access road, the North Piney Creek route, and directional drilling. The Commission concluded that Gulf had not ruled out the feasibility of either helicopter access or the northern road.

At the hearing, the area drilling superintendent for Gulf testified that in his opinion access by helicopter was "totally unfeasible" in view of the problems encountered in drilling an earlier well in the vicinity. However, no evidence was presented as to the cost of helicopter mobilization, the nature and amount of equipment that would need to be moved, or the number of trips with explosives that would occur.

The Commission received into evidence the environmental assessment of the drilling project, prepared by the Bureau of Land Management with assistance from the Forest Service. This document addresses helicopter mobilization at length and concludes that the method appears technically feasible, although more expensive than conventional means of access.

Gulf officials testified as to two problems presented by use of the northern access route, an alternative which required extending a road used by Gulf to reach an existing well on private property in the area. First, Gulf representatives had promised the landowner, Burns Industries, not to extend the road into the national forest, as part of the consideration for access across the property. This concession by Gulf was apparently due to the owner's concern that the Forest Service would subsequently condemn the Gulf road and allow public access through the property to the national forest.

The environmental assessment and accompanying maps indicate that use of the northern route would require upgrading an *existing* road on private property to the national forest boundary and two miles beyond:

"A feasible alternative to the southern route would be to extend this access road [from the existing well to the proposed well]. This would involve upgrading approximately 2 miles of existing road on private surface with realignments where existing road grades make it unfeasible to upgrade. The access route would then enter the Big Horn National Forest * * * and require that 2 miles of road [be] upgraded and 2.5 miles of new road construction. This existing access road is also known as the Kearney [L]ake Road." Environmental Assessment, supra.

This evidence before the Commission establishes the existence of a right-of-way across the Burns Industries property to the national forest and suggests the futility of any agreement between Gulf and the landowner not to construct such a road.

A second obstacle to using the northern route, according to Gulf, was the fact that the projected road traversed federal land included in the Roadless Area Review and Evaluation program (RARE II). Gulf expressed concern that the Forest Service had closed this area to road construction.

The Commission took notice of The Final Environmental Statement, Roadless Area Review and Evaluation, published in January, 1979, by the United States Department of Agriculture, Forest Service. This document describes the allocation of land included in the RARE II study to wilderness, further planning, or nonwilderness areas. The RARE II land at issue in the instant case is designated as nonwilderness, open to mineral development.

The environmental assessment depicts the affected RARE II land as a further planning area, but notes that mineral exploration is consistent with this designation as long as Gulf complies with the stipulations in its federal lease. Neither federal report confirms Gulf's contention that inclusion of an area in the RARE II program precludes road construction in that area.

■ Although Gulf representatives testified as to the impossibility of reaching the proposed drill site by either helicopter mobilization or the northern route, federal reports before the Commission indicate the feasibility of these means of access. We conclude, therefore, that substantial evi-

dence in the record supports the Commission's finding that Gulf failed to prove the absence of reasonable alternatives to the objectionable southern access road. We will not set aside the Commission's order based on that legally valid finding.

The order of the Commission granting permission to drill, provided Gulf not use its proposed southern access route, is affirmed.

ROONEY, Justice, dissenting, with whom BROWN, Justice, joins.

I believe the majority opinion reaches beyond the stars in its effort to find existence of authority in the Wyoming Oil and Gas Conservation Commission to decide where access roads shall be constructed over privately or publicly owned lands *under the guise of environmental control.*

Because the word "conservation" is in the name of the Commission, the majority opinion now gives the job of protecting the environment to the Commission. Quite a reach! First, the Commission's job is to "conserve" oil and gas and protect correlative rights—nothing else. And second, another agency is charged with environmental protection.

The area of interest on the part of the Commission is defined in § 30–5–101 et seq., W.S.1977. The entire thrust of the act is to prohibit "[t]he waste of oil and gas or either of them * * * as in this act defined" § 30–5–102(a), W.S.1977. Waste is defined in § 30–5–101(a) as pertaining only to oil and gas without any reference to the environment. It speaks of "[p]hysical waste, as that term is generally understood in the oil and gas industry," proper spacing of wells, flaring of gas, production in excess of transportation or storage facilities, prudent and proper operations, drilling to avoid or reduce the recoverable oil and gas, inefficient storing of oil and gas and dissipation of reservoir energy, etc.—all directed at eliminating waste, or at conservation of oil and gas. *Inexco Oil Company v. Oil and Gas Conservation Commission,* Wyo., 490 P.2d 1065 (1971). Nothing is said with reference to an environmental impact or effect occasioned by access roads—or even of the environmental effect of the oil or gas field itself.

The powers and duties given to the Commission are likewise directed to the same end. In § 30–5–104, W.S.1977, its jurisdiction and authority is that "necessary to effectuate the purposes and intent of this act." Can anyone take an impartial look at the act and not conclude its purpose and intent is only to prohibit waste of oil and gas, and to protect correlative rights in oil and gas, or stated the other way—to conserve oil and gas? There is nothing in the act directed at general environmental protection.

Correlative rights of those having an interest in oil and gas are protected by the Commission as an adjunct to the prevention of waste. Section 30–5–104 requires identification of ownership of wells, leases, tanks, etc., the filing of logs which are to be kept confidential for six months, and the establishment and regulation of units and pooling. The protection of correlative rights has nothing to do with the environment.

The only reference in the act having any concern with the environment is § 30–5–104(d)(ii), quoted in fn. 4 of the majority opinion, and that concern is with disposal of *oil field* wastes and "contamination or waste of underground water" resulting from oil field activities. The entire subsection (ii) is directed to *oil field* activities relating to waste of oil and gas, to correlative rights of those interested in the oil and gas, and to water contamination and waste. It makes no reference to access roads or environmental "eye sores." If Rule 326 (Chapter III, Section 26) of the Rules and Regulations of the Wyoming Oil and Gas Conservation Commission[1] goes beyond the statute's perimeters, it goes beyond

---

**1.** Rule 326 provides in part:
"The owner shall not pollute streams, underground water, or unreasonably damage the surface of the leased premises or other lands."

that authorized by law and amounts to an impermissible extension of the Commission's jurisdiction. There is no statutory authority for the provision in Rule 326 beyond that having to do with pollution of water, unless it is read to prohibit damage to land by oil waste being permitted to run onto the lands.

And this brings us to the second basis for reversing this case. The job of protecting the environment has been legislatively given to another agency. The Wyoming Environmental Quality Act (§ 35–11–101 et seq., W.S.1977) creates an agency to administer its provisions. The Act was designed to dovetail with the federal legislation on the subject. The legislature carefully defined that in which the created agency could act in control of the environment. If the incident here complained of was not included in that act, such was the legislative decision. Certainly, it is not intended that the Oil and Gas Conservation Commission should come in the back door and make environmental decisions entrusted to the agency set up to do so.

In *Rocky Mountain Oil and Gas Association v. State*, Wyo., 645 P.2d 1163 (1982), we noted an issue that was *not* before us relative to which agency, the Wyoming Oil and Gas Conservation Commission or the Environmental Quality Council, had authorization to control water discharge in connection with oil well activity. The issue in the case involved the availability of a declaratory judgment. We did quote the extensive definition of pollution set out in the Wyoming Environmental Quality Act (§ 35–11–103(a)(i), W.S.1977) and emphasized the language which provides that:

" ' * * * *This term does not mean water, gas or other material which is injected into a well to facilitate production of oil, or gas or water, derived in association with oil or gas production and disposed of in a well * * *.' "* (Emphasis in original.) 645 P.2d at 1165.

The importance of the discussion in *Rocky Mountain Oil and Gas Association v. State*, supra, as it pertains to this case, is the recognition that the Environmental Quality Council is recognized as having control over pollution of waters and of general environmental problems rather than the Oil and Gas Conservation Commission, perhaps with the exception of water pollution resulting from oil well activity.

I do not believe that we need to address the federal preemption issue. The Oil and Gas Conservation Commission had no jurisdiction over the question of whether or not an access road was improper on the basis of environmental injury.

I would return the case to the Commission with directions to issue or deny the requested permits without consideration of environmental questions beyond water pollution from well activity. The environmental and other access problems should be addressed in another forum and in another manner.