**VENTURA COUNTY, Appellant,**

v.

**GULF OIL CORPORATION, Appellee.**

**Nos. 77–2319, 77–2716.**

United States Court of Appeals, Ninth Circuit.

Aug. 3, 1979.

R. Thomas Harris, Asst. County Counsel, Ventura, Cal., for appellant.

Sylvia O. Cano, Deputy Atty. Gen. (argued), Los Angeles, Cal., amicus curiae, for appellant.

James L. O'Loughlin (argued), Richard W. Curtis, Los Angeles, Cal., for appellee.

Neil T. Proto, Washington, D. C., amicus curiae, for appellee.

Before HUFSTEDLER and WRIGHT, Circuit Judges, and CALLISTER,* District Judge.

HUFSTEDLER, Circuit Judge:

The question on appeal is whether the County of Ventura ("Ventura") can require the federal Government's lessee, Gulf Oil Corporation ("Gulf"), to obtain a permit from Ventura in compliance with Ventura's zoning ordinances governing oil exploration and extraction activities before Gulf can exercise its rights under the lease and drilling permits acquired from the Government. The district court denied Ventura's motion for a preliminary injunction, and dismissed Ventura's second amended complaint. Ventura appeals. We uphold the district court because the local ordinances impermissibly conflict with congressional regulation of Gulf's activities on government land.

On January 1, 1974, the Department of the Interior, Bureau of Land Management, pursuant to the Mineral Lands Leasing Act of 1920 (30 U.S.C. §§ 181 et seq.), leased 120 acres located within the Los Padres National Forest in Ventura for purposes of oil exploration and development. A subsequent assignment of this lease to Gulf was approved by the Department of the Interior, effective April 1, 1974. On February 25, 1976, the United States Department of the Interior, Geological Survey, issued a permit approving Gulf's proposal to drill an oil well pursuant to its lease. On March 8, 1976, and April 15, 1976, the United States Department of Agriculture, Forest Service, also granted its permission, and on March 8, 1976, the California Resources Agency, Division of Oil and Gas, approved the proposed exploration. After drilling operations were commenced on April 28, 1976, Gulf pursued activities related to oil exploration and extraction on the leased property, and it intends to continue development of both its present and other drill sites.

Throughout this period the leased property has been zoned Open Space ("O–S") by Ventura. Under its zoning ordinance, oil exploration and extraction activities are prohibited on O–S property unless an Open Space Use Permit is obtained from the Ventura County Planning Commission in accordance with Articles 25 and 43 of the Ventura County Ordinance Code. The O–S Use Permits are granted for such time and upon such conditions as the Planning Commission considers in the public interest. The permits contain 11 mandatory conditions and additional conditions are committed to the Planning Board's discretion.

On May 5, 1976, Ventura advised Gulf that it must obtain an O–S Use Permit if it wished to continue its drilling operations. Gulf refused to comply, and on May 20, 1976, Ventura brought suit in the California Superior Court seeking a declaratory judgment that Gulf's activities are subject to Ventura's zoning ordinances. The case was removed to the district court. Following the filing of its second amended complaint, Ventura moved for a preliminary injunction with respect to the first two counts of its second amended complaint, and Gulf moved to dismiss the complaint. The trial on the merits was consolidated with the hearing on Gulf's motions. After denying the injunction, the district court finally dismissed the action.[1]

---

* Honorable Marion J. Callister, United States District Judge, District of Idaho, sitting by designation.

1. The district court initially dismissed the first and second counts of the second amended complaint; Ventura thereafter stipulated to dismissal of the remaining counts of the complaint. Thereafter, the district court dismissed the entire action.

Ventura contends that the district court erred in concluding that the Supremacy Clause of the Constitution precludes enforcement of the zoning ordinances against Gulf both because Congress lacked the power to preempt local regulation and because, even assuming Congress had such power, its enactments provide no basis for finding preemption, either express or implied.

Although Ventura and amicus argue extensively that congressional enactments under the Property Clause [2] generally possess no preemptive capability, we believe that *Kleppe v. New Mexico* (1976) 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34, is dispositive. In *Kleppe*, New Mexico authorities entered federal lands and rounded up 19 wild burros pursuant to the New Mexico Estray Law, N.M. Stat. Ann. § 47–14–1 *et seq.* (1966). The Bureau of Land Management demanded the return of the burros under the Wild Free-roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340, which was passed in 1971 to protect wild horses and burros on the public lands of the United States. The New Mexico authorities refused to comply and sought a declaratory judgment that the act was unconstitutional. The Supreme Court upheld the act's constitutionality, stating:

> "Absent consent or cession a State, undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause. As we said in *Camfield v. United States*, 167 U.S. [518], at 526 [17 S.Ct. 864 at 867, 42 L.Ed. 260] in response to a somewhat different claim: 'A different rule would place the public domain of the United States completely at the mercy of state legislation.'" (*Kleppe v. New Mexico, supra,* 426 U.S. at 543, 96 S.Ct. at 2293 (citations omitted).)

New Mexico has argued for a narrow reading of the Property Clause, contending that the clause provided an independent basis of congressional jurisdiction only for acts concerning the disposition of federal property or incidental rules regarding its use and for acts necessary to protect federal lands. The Supreme Court stated in response that "we reject appellees' narrow reading of the Property Clause," and later continued that "while the furthest reaches of the power granted by the Property Clause have not yet been definitely resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is without limitations.'" (*Id.* at 537 and 539, 96 S.Ct. at 2290 and 2291.) In light of *Kleppe*, the renewed attempt to restrict the scope of congressional power under the Property Clause in the present case is legally frivolous.

Ventura next contends that even if Congress had the power to enact overriding legislation, there is no evidence of either a congressional intent to preempt local regulation or a conflict between local and federal law that can be resolved only by exclusion of local jurisdiction. We need not consider the extent to which local regulation of any aspect of oil exploration and extraction upon federal lands is precluded by federal legislation; the local ordinances impermissibly conflict with the Mineral Lands Leasing Act of 1920 and on this basis alone they cannot be applied to Gulf.

The extensive regulation of oil exploration and drilling under the Mineral Leasing Act is evident from the present record. The basic lease assigned to Gulf in 1974 contains approximately 45 paragraphs including requirements of diligence and protection of the environment as well as reservation of a one-eighth royalty interest in the United States. Because the lands lie within a National Forest, the lease requires Gulf's acceptance of additional Department of Agriculture conditions designed to com-

**2.** The Property Clause of the Constitution provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." (U.S.Const., Art. IV, § 3, cl. 2.)

bat the environmental hazards normally incident to mining operations. Specific drilling permits were also required from the Department of the Interior, Geological Survey, and the Department of Agriculture, Forest Service. The Geological Survey, which has formalized its procedures in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321 et seq.), approved the proposed drilling on February 25, 1976, subject to 10 conditions which assure continued and detailed supervision of Gulf's activities. And on March 8, and April 15, 1976, the Forest Service issued a drilling permit subject to conditions focusing upon protection of the National Forest. Finally, Gulf is subject to the extensive regulations governing oil and gas leasing (43 C.F.R., Part 3100) and both sub-surface and surface operations (30 C.F.R., Part 221) promulgated by the Secretary of the Interior under his authority "to prescribe necessary and proper rules and regulations to do any and all things necessary to carry out and accomplish the purposes" of the act. (30 U.S.C. § 189.) And since the lease concerns lands within a National Forest, Secretary of Agriculture regulations governing oil and gas development are also applicable. (36 C.F.R., Part 252.)

■ Despite this extensive federal scheme reflecting concern for the local environment as well as development of the nation's resources, Ventura demands a right of final approval. Ventura seeks to prohibit further activity by Gulf until it secures an Open Space Use Permit which may be issued on whatever conditions Ventura determines appropriate, or which may never be issued at all. The federal Government has authorized a specific use of federal lands, and Ventura cannot prohibit that use, either temporarily or permanently, in an attempt to substitute its judgment for that of Congress.

The present conflict is no less direct than that in *Kleppe v. New Mexico, supra.* Like *Kleppe,* our case involves a power struggle between local and federal governments concerning appropriate use of the public lands. That the New Mexico authorities wished to engage in activity that Congress prohibited, while the Ventura authorities wish to regulate conduct which Congress has authorized is a distinction without a legal difference.

■ Relying upon *Huron Portland Cement Co. v. Detroit* (1960) 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852, Ventura argues that this conclusion is unjustified because, unlike *Kleppe,* the present conflict has not ripened. (*See also Askew v. American Waterways Operators* (1973) 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280.) In *Huron,* the Court allowed application of a local smoke abatement ordinance to a vessel whose equipment had been federally licensed only because it concluded "that there is no overlap between the scope of the federal ship inspection laws and that of the municipal ordinance here involved." [3] (*Huron, supra,* 362 U.S. at 446, 80 S.Ct. at 817.) Ventura prefers the Court's observation: "To hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists." (*Id.* at 446, 80 S.Ct. at 817–818.) It argues that since Gulf has never applied for a use permit, an adjudication of preemption is in conflict with *Huron.* We disagree. This argument ignores the very relief that Ventura sought when it asked to enjoin Gulf's operations. Ventura cannot bring an action seeking immediate recognition and implementation of its veto power over the

3. It has been suggested that the Court was actually applying a balancing test and that because the state's interest in air quality protection was strong and only minimally impinged the federal regulatory scheme, the local ordinance was protected. (Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court,* 75 Colum.L.Rev. 623, 629 n. 37 (1975).) A recent case apparently applied a flexible supremacy, balancing test. (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware* (1973) 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348.) However, the conflict in the present case strikes at the heart of the federal regulation. The Mineral Lands Leasing Act and extensive permit procedures are designed for the very purpose of circumscribing the conditions under which the Government lessee will operate.

Government's lessee, and successfully contend that an adverse ruling would require "seeking out conflict" unnecessarily. The issue is whether Ventura has the power of ultimate control over the Government's lessee, and this issue persists whether or not a use permit would eventually be granted.

*Federal Power Commission v. Oregon* (1955) 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215, presented a similar question. In that case, the Federal Power Commission issued a license to construct and operate a private hydroelectric plant on reserved lands of the United States. The license included permission to construct a dam across the Deschutes River. Oregon challenged the exclusive jurisdiction of the Commission and contended that the licensee must acquire a state as well as a federal permit. The Court held that the Commission's jurisdiction over the reserved lands of the United States was proper under the Property Clause, and that this jurisdiction was exclusive: "To allow Oregon to veto such use, by requiring the State's additional permission, would result in the very duplication of regulatory control precluded by the *First Iowa* decision [*First Iowa Hydro-Electric Co-op. v. F.P.C.*] 328 U.S. 152, 177–179, 66 S.Ct. 906, 90 L.Ed. 1143. No such duplication of authority is called for by the Act." (*Id.* at 445, 75 S.Ct. at 838. *See* Federal Power Act, 16 U.S.C. §§ 791a–825r.)

Ventura attempts to distinguish *Federal Power Commission v. Oregon* on the basis of reservations of local jurisdiction contained in sections 30 and 32 of the Mineral Lands Leasing Act (30 U.S.C. §§ 187, 189).[4] It contends that although preemption was perhaps appropriate in light of the narrow reservations of local jurisdiction in the Federal Power Act, a similar finding in the present case is unwarranted given the broad savings provisions contained in the Mineral Lands Leasing Act.

■ The proviso in § 187 provides that "[n]one of *such provisions* shall be in conflict with the laws of the states in which the leased property is situated." (30 U.S.C. § 187.) But, as Gulf points out, by the use of the language "such provisions," the proviso relates only to the provisions of the preceding sentence. These provisions relate to employment practices, prevention of undue waste and monopoly, and diligence requirements. There is no mention of land use planning controls. Moreover, the proviso assures only that the Secretary of the Interior shall observe state standards in drafting the lease's terms. It is not a recognition of concurrent state jurisdiction.

■ Nor is the savings clause in § 189 of any avail. After delegating to the Secre-

4. Before its 1978 amendment, section 30 provided in pertinent part:

"Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property; a provision that such rules for the safety and welfare of the miners and for the prevention of undue waste as may be prescribed by said Secretary shall be observed, including a restriction of the workday to not exceeding eight hours in any one day for underground workers except in cases of emergency; provisions prohibiting the employment of any boy under the age of sixteen or the employment of any girl or woman, without regard to age, in any mine below the surface; provisions securing the workmen complete freedom of purchase; provisions requiring the payment of wages at least twice a month in lawful money of the United States, and providing proper rules and regulations to insure the fair and just weighing or measurement of the coal mined by each miner, and such other provisions as he may deem necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare. None of such provisions shall be in conflict with the laws of the states in which the leased property is situated."

Section 32 provides:

"The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter, also to fix and determine the boundary lines of any structure, or oil or gas field, for the purposes of this chapter. Nothing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States."

tary of the Interior broad authority to prescribe rules and regulations necessary to effect the purposes of the act, the section continues:

> "Nothing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States." (30 U.S.C. § 189.)

The proviso preserves to the states only "any rights which they may have." While this is an express recognition of the right of the states to tax activities of the Government's lessee pursuant to its lease (*Oklahoma Tax Commission v. Texas Co.* (1949) 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721), and has been relied upon in part to uphold forced pooling and well spacing of federal mineral lessee operations (*Texas Oil & Gas Corp. v. Phillips Petroleum Co.* (W.D.Okl.1967) 277 F.Supp. 366, 371, *aff'd* (10th Cir. 1969) 406 F.2d 1303, 1304), the proviso cannot give authority to the state which it does not already possess. Although state law may apply where it presents "no significant threat to any identifiable federal policy or interest" (*Texas Oil & Gas Corp. v. Phillips Petroleum Co., supra,* at 371), the states and their subdivisions have no right to apply local regulations impermissibly conflicting with achievement of a congressionally approved use of federal lands and the proviso of § 189 does not alter this principle.

██ Finally, we are reassured in the correctness of our decision by policy considerations implicitly reflected in the structure and operation of the Mineral Lands Leasing Act of 1920 and the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321 *et seq.*). As Ventura recognized in filing its second amended complaint, the National Environmental Protection Act ("NEPA") and the guidelines, regulations, and Executive Orders issued in pursuance of that act,[5]

mandate extensive federal consideration and federal-local cooperation concerning the local, environmental impact of federal action under the Mineral Lands Leasing Act. If federal officials fail to comply with these requirements, Ventura has a remedy against those officials.

Our decision does not mean that local interests will be unheard or unprotected. In rejecting a local veto power while simultaneously guarding local concerns under NEPA, local interests can be represented, the integrity of the federal leases and drilling permits reconciling national energy needs and local environmental interests can be protected, and the ultimate lessee will be responsible to a single master rather than conflicting authority.

██ Although we recognize that federal incursions upon the historic police power of the states are not to be found without good cause (*see, e. g., Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447), we must affirm because "under the circumstances of this particular case, [the local ordinances] stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581. *Accord, Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 526, 97 S.Ct. 1305, 51 L.Ed.2d 604.) "[W]here those state laws conflict . . . with other legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede." (*Kleppe v. New Mexico, supra,* 426 U.S. at 543, 96 S.Ct. at 2293–2294.)

AFFIRMED.

---

[5] *See; e.g.,* National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; Guidelines of the Council on Environmental Quality, 40 C.F.R., Part 1500; Executive Order Number 11514, 35 Fed.Reg. 4247, March 5, 1970.