**GRACE GEOTHERMAL CORPORATION, a Delaware corporation, Plaintiff,**

v.

**NORTHERN CALIFORNIA POWER AGENCY, et al., Defendants.**

**No. C–84–6741 JPV.**

United States District Court, N.D. California.

June 14, 1985.

Michael R. Marron, Arnold S. Rosenberg, Morris Baller, Marron, Reid & Sheehy, San Francisco, Cal., for plaintiff.

Martin McDonough, Dennis W. DeCuir, Stuart L. Somach, McDonough, Holland & Allen, Sacramento, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE ENTRY OF PRELIMINARY INJUNCTION

VUKASIN, District Judge.

### INTRODUCTION

Plaintiff Grace Geothermal Corporation ["Grace"] instituted the above-referenced action against defendants Northern California Power Agency ["NCPA"]; the Cities of Alameda, Biggs, Gridley, Healdsburg, Lodi, Lompoc, Palo Alto, Redding, Roseville, Santa Clara, and Ukiah; the Plumas-Sierra Rural Electric Cooperative; and Robert Grimshaw. At the time of filing the complaint on October 11, 1984, plaintiff further filed a Motion for Temporary Restraining Order and Preliminary Injunction.

Oral argument on this Motion was entertained by the Court, the Honorable J.P. Vukasin, Jr., presiding, on October 15, 1984, and again on October 19, 1984. Michael R. Marron, Esq., and Arnold S. Rosenberg, Esq., of Marron, Reid & Sheehy appeared for plaintiff; defendant NCPA was represented by Dennis W. DeCuir, Esq., Stuart L. Somach, Esq., and Allen Ciamporcero, Esq., of McDonough, Holland & Allen. The Court heard argument for approximately two and one-half hours,[1] at the conclusion of which on October 19, 1984, the Court granted plaintiff's Motion for a Preliminary Injunction. The Court thereupon dictated into the record an Order enjoining defendants from filing eminent domain or condemnation proceedings, or any other litigation, against plaintiff's interest in the property which is the subject of this action. On October 24, 1984, the Court signed and filed its written Order Granting Preliminary Injunction and Setting Bond.

NCPA appealed the Order of October 24, 1984 to the United States Court of Appeals for the Ninth Circuit. The matter was argued and submitted on April 9, 1985; on May 2, 1985, the Court of Appeals, 762

---

1. The Court further had before it on October 19, 1985, and had read and considered, the following documentary materials:

(1) Plaintiff's Complaint, filed 10/11/84;

(2) Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, filed 10/11/84;

(3) Plaintiff's Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order, filed 10/11/84;

(4) Declaration of Oliver Grace in Support of Plaintiff's Motions, with attachments, filed 10/11/84;

(5) Declaration of Dr. C.W. Berge in Support of Plaintiff's Motions, filed 10/11/84;

(6) Declaration of John Grace in Support of Plaintiff's Motions, filed 10/11/84;

(7) Defendant NCPA's Memorandum of Points and Authorities in Opposition to Plaintiff's Motions, filed 10/17/84;

(8) Defendant's Declaration of Homer D. Schaaf in Opposition to Plaintiff's Motions, filed 10/17/84;

(9) Defendant's Declaration of Richard H. Molke, Jr., in Opposition to Plaintiff's Motions, filed 10/17/84;

(10) Defendant's Declaration of James W. Whalen in Opposition to Plaintiff's Motions, filed 10/17/84;

(11) Defendant's Declaration of Paul E. Cavote in Opposition to Plaintiff's Motions, filed 10/17/84;

(12) Defendant's Exhibits A–F re its Memorandum of Points and Authorities, filed 10/17/84;

(13) Plaintiff's Reply Memorandum of Points and Authorities, filed 10/18/84;

(14) Plaintiff's Declaration of Arnold S. Rosenberg in Support of its Motions, filed 10/18/84;

(15) Plaintiff's Declaration of Michael Saburn in Support of its Motions, filed 10/18/84; and

(16) NCPA Preliminary Official Statement, dated October 15, 1984, filed 10/19/84.

F.2d 1017, remanded the cause to this Court for entry of Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure.

In response to the mandate of the Ninth Circuit, the Court hereby renders the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Grace is a corporation incorporated under the laws of the State of Delaware; its principal place of business is in New York. NCPA is a California joint powers public agency organized pursuant to Cal. Govt.Code § 6500 *et seq.* Defendant Robert E. Grimshaw was, at the time of the filing of Grace's complaint, the General Manager of NCPA. The remaining defendants are public entity members of NCPA; all are located in the State of California. The amount in controversy in this action exceeds $10,000.00 independent of interest and costs.

2. Grace is the lessee under United States Geothermal Resources Leases Nos. CA–949 and CA–950 [the "federal leases"]. Said leases were granted by the United States Department of the Interior, Bureau of Land Management ["BLM"], as lessor. The federal leases cover 4,076 acres of federally-owned land in the Geysers Known Geothermal Resources Area in Sonoma and Lake Counties, California. Decl. of O. Grace, ¶ 4 and Exh. A, B.

3. Grace acquired the federal leases from Shell California Production, Inc., in 1983, subject to two Steam Sales Agreements between Shell and NCPA. Decl. of O. Grace, ¶¶ 4, 6. The Steam Sales Agreements, entered into in 1977 and 1980, commit Grace to sell geothermal steam from a 2,000 acre portion of the federal leases to NCPA, for use by the latter in electric power generation. Decl. of O. Grace, ¶¶ 6, 7. The Agreements contain detailed provisions governing the production and delivery of geothermal steam by Grace to NCPA, and provisions for resolution of disputes by arbitration. Decl. of O. Grace,

¶ 16 and Exh. C, D. NCPA has no contractual right to any steam produced beyond the amount committed to NCPA, nor to any steam produced on other portions of the federal leases. Decl. of O. Grace, ¶ 7.

4. On August 31, 1982, BLM approved the assignment of the federal leases by Shell to Grace. Decl. of O. Grace, ¶ 4 and Ex. C, D.

5. The federal leases which are the subject of this action constitute one of Grace's principal assets. Suppl.Decl. of O. Grace, ¶ 2. Grace has committed virtually all of its assets and operations to the development of geothermal steam resources for sale to electric utilities for power generating purposes, and the Steam Sales Agreements implicated in this action generate virtually all of its operating revenue. Decl. of O. Grace, ¶¶ 6–8, 15; Suppl.Decl. of O. Grace, ¶ 2.

6. Grace's acquisition and development of the federal leases has been in accordance with the purposes and provisions of the Geothermal Steam Act, 30 U.S.C. §§ 1001 *et seq.*

7. NCPA constructed, owns, and, since January 1, 1983, has operated a geothermal power plant and related facilities [the "Geothermal Plant No. 2"] which utilizes geothermal steam produced on the federal leases. In addition, by October 19, 1984, NCPA had completed approximately 71% of its construction of an additional geothermal plant ["Geothermal Plant No. 3"] which will also utilize geothermal steam from the federal leases. Geothermal Plant No. 3 is scheduled to produce its first electrical power in the third quarter of 1985. Decl. of Whalen, ¶ 5.

8. The Steam Sales Agreements require at least 1000-foot spacing between the open intervals of wells funded by NCPA and existing wells. Decl. of Berge, ¶ 4. Notwithstanding this, NCPA requested Grace in July, 1984, to drill a well less than 1000 feet from an existing well. Grace initially refused. Decl. of O. Grace, ¶ 9. Grace's refusal was based on its belief that if a geothermal well is drilled at a point too

near to existing wells where steam is known to exist, and steam is then drawn from the wells too fast, this may create an increased risk of damage to the fracture system and well bore through which the steam flows. Decl. of Berge, ¶ 5. On or about August 7, 1984, Grace offered to permit NCPA to drill one well within 1000 feet of existing wells if NCPA would agree to honor the 1000-foot spacing limitation in the future. NCPA refused. Decl. of O. Grace, ¶ 10.

9. NCPA's request that Grace drill a well less than 1000 feet from an existing well was based on NCPA's concern that its geothermal steam requirements for Geothermal Plant No. 3 either would not be met by Grace or not be met by Grace in a timely fashion and that NCPA would be unable to satisfy its commercial operations schedule. Decl. of Whalen, ¶¶ 5–17.

10. In August, 1984, NCPA decided to attempt to acquire Grace's interest in the federal leases.

11. On August 22, 1984, defendant Grimshaw wrote a letter to Grace offering $145,000,000.00 for the portion of the federal leases dedicated to supplying NCPA's geothermal steam requirements. The letter alerted Grace that if the offer were not accepted by the following day NCPA would commence condemnation proceedings. Decl. of O. Grace, ¶ 11; Suppl.Decl. of O. Grace, Ex. B.

12. On August 12, 1984, NCPA adopted a resolution approving the offer of a purchase price of $145,000,000.00 in accordance with Grimshaw's letter of August 22, 1984, if accepted by Grace's Board of Directors by Tuesday, September 4, 1984. The resolution further provided that if the offer was not accepted, Grimshaw was authorized to obtain an appraisal of the property as the basis for acquisition through condemnation and that Grimshaw and NCPA's General Counsel were authorized to take all necessary steps to prepare for early acquisition of Grace's interests in the federal leases. Decl. of O. Grace, ¶ 11; Suppl.Decl. of O. Grace, Ex. C.

13. On September 1, 1984, the parties entered into a Memorandum of Understanding for the transfer of the leasehold interest held by Grace, pursuant to a transfer agreement that was to be reached by October 15, 1984. Dft's.Memo., Ex. A.

14. On September 27, 1984, pursuant to California statutes governing condemnation actions, NCPA sent Grace a precondemnation offer and a notice of hearing on the necessity for condemnation proceedings. Decl. of O. Grace, ¶ 12 and Ex. G. The September 27 offer price was, like that announced on August 22, 1984, $145,000,000.00; unlike the earlier offer, however, that price was proposed for the entire 4,067 acres of federal leasehold property. *Id.*

15. On October 3, 1984, Grace wrote NCPA stating that Grace did not consider the September 1 Memorandum of Understanding binding because it had been obtained in a coercive manner. Dft's.Memo., Ex. D.

16. The hearing at which NCPA was to adopt the requisite resolution of necessity was scheduled for October 12, 1984. That hearing was held and the resolution was passed on that date. Dft.Memo., Ex. F. At the October 15, 1984, hearing this Court announced its intention to enter a Temporary Restraining Order precluding defendants from acting upon the resolution of necessity by instituting condemnation proceedings. Counsel for NCPA, contending that issuance of such an Order would be devastating to NCPA's proposed bond offering, *See* Findings of Fact *infra*, ¶ 27, agreed to take no action on condemnation pending the October 19, 1984, hearing on Plaintiff's Motion for Preliminary Injunction.

17. Were Grace to lose possession of the federal leasehold in a condemnation action, it would be deprived of its principal revenue-generating asset, leading to loss of its business operations and all of its operating income. Suppl.Decl. of O. Grace, ¶ 2.

18. Grace is obligated to pay interest on over $100,000,000.00 of bonds issued to finance its acquisition and development of the federal leases. Decl. of O. Grace, ¶ 14.

Loss of possession of the federal leasehold would deprive Grace of the means with which to pay interest due on the bonds, Decl. of O. Grace, ¶ 14, and could result in default on those bonds within two months. Suppl.Decl. of O. Grace, ¶ 2. The bond indenture trustee could then accelerate the principal obligation. Decl. of O. Grace, ¶ 14. Grace would not have sufficient resources to pay off that obligation. Decl. of O. Grace, ¶ 2.

19. In addition, loss of possession of the federal leasehold would deprive Grace of the means with which to meet its ongoing expenses for employee payroll and for leasehold development on this and other properties. Decl. of O. Grace, ¶ 15.

(a) Loss of possession of the federal leasehold would deprive Grace of the means to pay key employees and would require their termination. *Id.*

(b) Loss of possession of the federal leasehold would damage Grace's credit, and would probably lead to cancellation of the line of credit needed by Grace to develop other properties. Without access to credit, those properties cannot be developed. *Id.*

20. Grace has contracted to sell Pacific Gas & Electric Company ["PG & E"] electricity produced on the federal leasehold from certain steam not committed to NCPA under the Steam Sales Agreements. Loss of possession of the federal leasehold would deprive Grace of the ability to produce electricity for sale to PG & E under the contract. Decl. of O. Grace, ¶¶ 8, 15.

21. In evaluating the foregoing probable consequences of NCPA's taking possession of Grace's federal leasehold via condemnation, Grace's Chairman of the Board has concluded that, if condemnation is allowed to proceed, "GRACE will be destroyed as a going business." Suppl.Decl. of O. Grace, ¶ 2. The Court finds that statement to be credible.

22. The procedures and standards applicable to any condemnation by NCPA of Grace's federal leases are codified in the California Eminent Domain Law [the "Eminent Domain Law"], Cal.Civ.Proc.Code §§ 1230.010 *et seq.*

23. The Court's analysis reveals that the Eminent Domain Law does not necessarily assure that Grace will have a clear, complete, and adequate remedy at law; particularly, Grace is not assured of a full and fair hearing on its legal objections and defenses to NCPA's right to exercise the power of eminent domain prior to NCPA's taking possession of the subject property. *See* Conclusions of Law *infra,* ¶¶ 3–6.

24. The Court finds that NCPA could potentially take the leases from Grace in as little as three days after filing of the condemnation action. *See* Conclusions of Law *infra,* ¶ 6(d). In light of the fact that loss of possession would terminate Grace's operating revenues, causing irreparable adverse consequences, *see* Findings of Fact *supra,* ¶¶ 17–21—including, in particular, a potential bond default within sixty days— the Court finds that any taking under the Eminent Domain law could proceed so quickly that it would not allow Grace to protect its vital interests as a viable business entity.

25. In view of these consequences to Grace, neither the payment to Grace of the deposit amount required by the Eminent Domain Law nor the award of money damages in this or another action would provide Grace with an adequate remedy.

(a) Acceptance by Grace of the deposit amount would, under the Eminent Domain Law, preclude Grace from continuing to contest NCPA's right to take the property by condemnation. *See* Conclusions of Law *infra,* ¶ 6(h). Grace's endangered financial status could compel it to accept such a deposit in order to pay interest to its bondholders; it would thereby be deprived of the means necessary to maintaining possession of the property and continuing its business.

(b) The controversy between Grace and NCPA is complex, turning largely on refined questions of federal law. *See* Conclusions of Law *infra,* ¶ 3. Its final resolution will not occur quickly. Any future award of damages to Grace would come far

too late to provide it with a means of continuing its operations. Injury to these operations, in the form of possible bond default, loss or termination of employees, inability to develop other properties, loss of the PG & E contract and, quite possibly, the end of Grace as a viable corporation, would be a *fait accompli* by the time any damages award could be collected. Decl. of O. Grace, ¶¶ 14–15; Suppl.Decl. of O. Grace, § 2.

26. To grant the preliminary injunction would do no more than preserve the status quo, by which Grace owns the federal leases and sells NCPA geothermal steam adequate for the latter's electricity generation needs pursuant to the 1977 and 1980 Steam Sales Agreements. Said Agreements provide NCPA with both steam rights and the right to finance drilling to produce additional steam if necessary. Decl. of O. Grace, ¶¶ 6–7, 17. The Court finds that Grace has adhered, and continues to adhere, to the terms of the Steam Sales Agreements.

27. NCPA planned a $400,000,000.00 bond offering in October, 1984, in order to finance the completion of its geothermal generating units and related facilities on the federal leaseholds. NCPA Preliminary Official Statement, dated October 15, 1984, p. i; Decl. of Whalen, ¶ 12. Both in its written documents and at oral argument, NCPA claimed that the primary injury that it would sustain if the preliminary injunction were granted would be the jeopardizing of this bond sale. Dft's.Memo. at 22–25. Decl. of Schaff, ¶¶ 4–8. NCPA further argued that approval by the electorate of Proposition 36, the so-called Jarvis Tax Initiative, at the November, 1984, General Election, would effectively deprive NCPA of access to the credit market. Dft's. Memo. at 23. NCPA's theory was that if the Court granted an injunction NCPA would be unable to market its bonds as scheduled prior to the General Election and would be barred from the relevant bond markets by the passage of Proposition 36 after the Election. *Id.* at 24; *see also* NCPA Preliminary Official Statement, Appendix G.

28. The Court hereby takes judicial notice that the electorate defeated Proposition 36 at the November, 1984, General Election. Official Statement of Vote, General Election, compiled by March Fong Eu, Secretary of State, p. 32.

29. The Court further takes judicial notice that on October 31, 1984, NCPA sold $400,000,000.00 in revenue bonds, notwithstanding issuance of the preliminary injunction. Standard & Poor's Creditweek, November 19, 1984, p. 482.

30. Contrary to NCPA's repeated and emphatic representations to the Court that any delay—or even suggestion of delay—in the condemnation proceedings would cause immediate and irreparable harm, NCPA represented three times in its Official Statement for the 1984 bond offering that, "[s]hould condemnation be necessary [to acquire the federal leases], ... any delay in obtaining possession [after institution of the condemnation proceedings] will not materially adversely affect the proposed operations of the Project." NCPA Preliminary Official Statement, pp. 12, 42, A–3.

31. In view of the statements of NCPA quoted in Finding 30 *supra,* The Court can find no irreparable injury to NCPA resulting from issuance of the preliminary injunction.

(a) The Court finds Grace's assurance that it will continue to provide steam to NCPA as provided by the Steam Sales Agreements to be credible. *See* Finding 26 *supra.*

32. The injury which Grace would suffer by the Court's denial of the requested injunction is far greater than any injury which NCPA can credibly claim.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331. Because of the existence of jurisdiction based on a federal question, it is unnecessary to determine whether the Court also has jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C.

§ 1332. Diversity jurisdiction, however, appears to exist.

2. Before granting a preliminary injunction, the Court must find that the party seeking the injunction has demonstrated *"either* a combination of probable success on the merits and a possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Beltran v. Myers,* 677 F.2d 1317, 1320 (9th Cir.1982) (emphasis in original). These tests are "not separate." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). Rather, they represent the "outer reaches of a single continuum." *Id.,* quoting *Benda v. Grand Lodge of Int'l Assoc. of Machinists, etc.,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). The Court may also properly consider whether the public interest would be advanced by granting the injunction. *See, e.g., Zepeda v. United States I.N.S.,* 753 F.2d 719, 727 (9th Cir.1985), *citing Sierra Club v. Hathaway,* 579 F.2d 1162, 1167 (9th Cir.1978). As with any form of equitable relief, inadequacy of available legal remedies is a prerequisite to issuance of an injunction. *Los Angeles Memorial Coliseum Comm'n, supra,* 634 F.2d at 1201, citing *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974).

3. Grace's Complaint raises serious questions of federal law. For the reasons hereinafter stated, there is, further a strong probability that Grace will succeed on the merits of this action, particularly on the issue of whether NCPA's exercise of its state powers of eminent domain with regard to Grace's federal geothermal leases is barred by the Supremacy Clause of the United States Constitution. U.S. Const., art. VI, cl. 2.

(a) The leaseholds in question were acquired under the provisions of the Geothermal Steam Act of 1970. 30 U.S.C. § 1001 *et seq.* Section 23(b) of the Act, 30 U.S.C. § 1022(b), provides:

> Rights to develop and utilize geothermal resources underlying lands owned by the United States may be acquired solely in accordance with the provisions of this chapter.

Nowhere in the Act is there authority for state or local condemnation of federal geothermal leases.

(b) Pursuant to the authority conferred by Section 24 of the Act, 30 U.S.C. § 1023, the Secretary of the Interior has established a comprehensive regulatory scheme which is inconsistent with NCPA's claimed right of condemnation. 43 C.F.R. § 3201 *et seq.*

(i) New leases ordinarily may be acquired only through competitive bidding. 43 C.F.R. §§ 3207.2–1, 3207.3, 3220. Any assignment or transfer of a geothermal lease or an interest therein must be filed with BLM within 90 days thereof, must be signed by the parties, and "must contain all of the terms and conditions *agreed upon* by the parties thereto...." 43 C.F.R. § 3241.1 (emphasis added).

(ii) The regulations permit involuntary termination of the rights of a federal geothermal steam lessee in a producing property only by means of cancellation. This is allowed only if the terms of the lease have been violated, and only BLM has the power to cancel a federal geothermal steam lease. 43 C.F.R. § 3241.1 *et seq.* Cancellation procedures guarantee that, at its request, a lessee will be afforded a federal administrative hearing conducted by an administrative law judge. *Id.*

(iii) Thus, none of the applicable regulations purports to vest states or cities with power to condemn federal geothermal steam leases, and the entire regulatory scheme is inconsistent with such power.

(c) A primary purpose of the Geothermal Steam Act of 1970 was "to encourage private enterprise to invest in and develop" federal geothermal resources. S.Rep. No. 1160, 91st Cong., 2d Sess., at 3–4, U.S.Code Cong. & Admin.News 1970, p. 5113. Subjecting federal geothermal leases issued under the Act to the eminent domain powers of state and local governmental entities

would be inconsistent with, and would adversely affect, the accomplishment of this federal purpose. The willingness and ability of private enterprise to acquire and develop federal geothermal leases would be substantially and negatively affected by allowing NCPA to condemn the subject leases; this precedent would inhibit private acquisition and development of federal geothermal leases by raising the ever-present spectre of possible condemnation of such leases by state and local entities. In addition, the amounts bid in future competitive bidding to acquire such leases would probably be less than if the risk of condemnation were absent; federal revenues would thus be adversely affected.

(d) A number of Court of Appeals decisions have proscribed, on the basis of the Supremacy Clause, condemnation and similar state interference with federal leases. In *Transwestern Pipeline Co. v. Kerr-McGee Corp.*, 492 F.2d 878 (10th Cir.1974), the Court held that federal leases under the Mineral Leasing Act of 1920 were not subject to condemnation. *Id.*, at 883–84. In *Kirkpatrick Oil & Gas Co. v. United States*, 675 F.2d 1122, 1125–26 (10th Cir. 1982), the Court refused to bind federal leases by a state-compelled communitization of oil and gas interests. The Ninth Circuit has held that oil exploration and extraction activities on federal leaseholds are not subject to the permit requirements of local county zoning ordinances. *Ventura County v. Gulf Oil Corp.*, 601 F.2d 1080, 1084–86 (9th Cir.1979); *see also Union Oil Co. v. Minier*, 437 F.2d 408, 411 (9th Cir.1970).

4. Grace has further demonstrated probable success on its contention that NCPA lacks the power to condemn Grace's interest in the federal leases. This argument is based on Cal.Govt.Code § 6508, which prohibits joint agencies such as NCPA from condemning, for an electrical generation project, "property owned or otherwise subject to use or control by any public utility within the state." *Id.* It is probable that PG & E's contractual interest in the steam production of the federal leases makes such leases "subject to use … by a public utility" within the meaning of the statute. *See* Findings of Fact *supra,* ¶ 20.

5. Plaintiff is likely to be irreparably injured if the Court does not enjoin defendants from proceeding with the projected condemnation action. *See* Findings of Fact *supra,* ¶¶ 17–21.

6. After a careful review of the Eminent Domain Law, Cal.Civ.Proc.Code §§ 1230.010 *et seq.,* and the relevant decisional law, the Court is unpersuaded that the Eminent Domain Law furnishes Grace with a clear, complete, and adequate remedy at law in this case. The Eminent Domain Law does not adequately insure that Grace will receive a full and fair hearing on its legal objections and defenses to NCPA's right to take prior to any loss of possession of the property. This conclusion is based on the following construction of the applicable provisions of the Eminent Domain Law:

(a) The defendant in an eminent domain proceeding may raise by answer or demurrer its legal objections and defenses to the plaintiff's right to take. Cal.Civ.Proc.Code §§ 1250.350, 1250.360, 1250.370.

(b) At the time of filing an eminent domain complaint, or at any time thereafter, the plaintiff may apply on an *ex parte* basis for an order for possession of the property. Cal.Civ.Proc.Code, § 1255.410.

(c) The issuance of an order for possession is mandatory provided that the plaintiff has adopted the statutorily-required resolution of necessity—as NCPA has in fact done—and has deposited the amount required by statute with the court. Cal. Civ.Proc.Code § 1255.410(a).

(d) Although the order for possession is generally effective in ninety days, *see* Cal. Civ.Proc.Code § 1255.450(b), the court can make it effective as early as three days after issuance; the court's determination of the effective date of the order for possession is on an *ex parte* basis. Cal.Civ.Proc. Code § 1255.410(c).

(e) The defendant may file a motion for relief seeking a stay of the order for possession on the basis that the taking of possession will cause the defendant substantial hardship. The motion for relief and stay must be denied, however, if the plaintiff makes a showing that it needs possession of the property within the time specified in the order for possession and that a stay would cause the plaintiff substantial hardship. Cal.Civ.Proc.Code § 1255.420.

(f) Where the defendant has objected to the plaintiff's right to take, the court may stay the order for possession until it has ruled on the objections if it finds that there is a reasonable probability that the defendant will prevail. Cal.Civ.Proc.Code § 1255.-430. The procedure to be followed by the court in making this determination is not specified by the statute, and there is no decision of any California appellate court interpreting § 1255.430 or establishing the proper procedures to be followed. Because of this, the present Court is unable to state that there is any adequate assurance that, prior to the loss of possession of the property, the defendant would receive a full and fair hearing on its legal objections and defenses to the plaintiff's right to take.

(g) The defendant can seek judicial review of the validity of the plaintiff's resolution of necessity. Cal.Civ.Proc.Code § 1245.255(a)(1), (2). However, such review does not encompass or decide the defendant's legal objections and defenses to the plaintiff's right to take. Moreover, the action seeking judicial review of the resolution must be dismissed upon commencement of the eminent domain action unless the court determines that dismissal will not be in the interests of justice. Cal.Civ.Proc. Code § 1245.255(a)(1).

(h) If the defendant withdraws any portion of the deposit in a condemnation proceeding, the defendant thereby waives the right to contest the plaintiff's right to exercise the power of eminent domain or the sufficiency of the resolution of necessity. In such a case, the defendant's sole remaining remedy is to claim greater compensation for the property. Cal.Civ.Proc.Code § 1255.260.

7. The balance of hardships tips strongly in favor of Grace.

(a) Absent preliminary injunctive relief, there is a substantial likelihood that Grace would be destroyed as a business entity. Even were Grace not completely destroyed by loss of possession of the federal leaseholds, it would be deprived of its principal revenue-generating asset, and its ability to finance, manage, and staff operations on other properties would in all likelihood be destroyed.

(b) In contrast, NCPA will not be greatly harmed by issuance of a preliminary injunction preserving the status quo as to ownership of the leases. NCPA currently receives steam from Grace pursuant to the Steam Sales Agreements, and enjoys the right thereunder to finance such additional drilling by Grace, within the terms of the Agreements, as may be necessary to assure the production and delivery of steam for NCPA's future operations. The Agreements further provide a speedy and fair means, through arbitration, of resolving disputes concerning development of the property or production and delivery of steam to NCPA.

(c) The Court notes that most of NCPA's claims of hardship arise from complicated disputes involving the parties' operation of the steam field. Decl. of Whalen; Decl. of Cavote. The Court is unable to resolve these disputes at the present stage of the proceedings; the issues posed by said disputes are removed both from the scope of the litigation at this stage—where plaintiff's request for injunctive relief is concurrent with the filing of the complaint—and from the major contention on the merits underlying plaintiff's suit: that federal law and policy preclude condemnation of the federal leases. For these reasons and because, as noted in the preceding paragraph, the arbitration provision of the Steam Sales Agreements gives NCPA a more appropriate forum for prompt resolution of its claims concerning the operating disputes, the Court concludes that NCPA has failed at this time to demonstrate that it will be irreparably injured by issuance of the preliminary injunction.

(d) The Court further concludes that possible hardship to NCPA with regard to its ability to sell its bonds—allegedly resulting from issuance of the preliminary injunction herein—is at present negligible. Indeed, it appears to the Court that NCPA has suffered little or no harm on account of the preliminary injunction. *See* Findings of Fact *supra,* ¶ 29. Notwithstanding this, it is clear that, were injunctive relief to be denied, Grace would suffer hardship far in excess of any prospective hardship which might be suffered by NCPA.

8. It is in the public interest and in accordance with federal policy that federal geothermal leases held by private developers not be subject to the eminent domain power of state and local governments.

9. Grace has established a strong probability of success on the merits as well as a likelihood of irreparable injury should the preliminary injunction not issue; it has further demonstrated that serious questions concerning the ability of state and local governmental entities to acquire federal geothermal leaseholds by condemnation are raised in the present lawsuit, and that the balance of hardships tips sharply in Grace's favor.

10. Plaintiff is therefore entitled to preliminary injunctive relief as prayed for in its complaint.