**GRANITE ROCK COMPANY, a corporation, Plaintiff-Appellant,**

v.

**CALIFORNIA COASTAL COMMISSION, an Administrative Agency of the State of California, Defendant-Appellee.**

No. 84–2146.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 1985.

Decided Aug. 14, 1985.

Barbara R. Banke, Jess S. Jackson, Jackson, Jacobsen & Banke, San Francisco, Cal., James G. Heisinger, Carmel, Cal., Burton J. Goldstein, Goldstein, Barceloux & Goldstein, San Francisco, Cal., for plaintiff-appellant.

John K. Van de Kamp, Atty. Gen., Andrea Sheridan Ordin, N. Gregory Taylor, Joseph Barbieri, Linus Masourdeis, Asst. Attys. Gen., San Francisco, Cal., F. Henry Habicht, II, Peter R. Steenland, Jr., Anne S. Almy, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Norman C. Gorsuch, Juneau, Alaska, Michael Lilly, Atty. Gen., Honolulu, Hawaii, Brian McKay, Carson City, Nev., David Frohnmayer, Salem, Or., John D. Leshy, Tempe, Ariz., Robert K. Corbin, Phoenix, Ariz., Mike Greely, Helena, Mont., Paul Bardacke, Santa Fe, N.M., David L. Wilkinson, Salt Lake City, Utah, amicus curiae.

Before WALLACE and POOLE, Circuit Judges, and STEPHENS,* District Judge.

* Honorable Albert Lee Stephens, Jr., United States District Judge, Central District of California, sitting by designation.

WALLACE, Circuit Judge:

Granite Rock Company (Granite Rock) appeals the district court's refusal to enjoin the California Coastal Commission (Coastal Commission) from requiring Granite Rock to obtain a state permit in order to continue mining on federally owned forest land. *Granite Rock Co. v. California Coastal Commission,* 590 F.Supp. 1361 (N.D.Cal. 1984) (*Granite Rock*). We have jurisdiction under 28 U.S.C. § 1291. We reverse.

I

Granite Rock is engaged in the business of mining chemical grade white limestone. Its mining operations involved in this appeal are located on an unpatented mining claim on land owned by the federal government in the Los Padres National Forest at Pico Blanco. Granite Rock acquired the mining claim at Pico Blanco in 1959 pursuant to the Act of May 10, 1872, ch. 152, 17 Stat. 91 (codified as amended in scattered sections of 30 U.S.C.) (Mining Act). It began mining the claim in 1981 after the United States Forest Service (Forest Service) approved its five-year plan of operations, which it had submitted as required for significant mining activities pursuant to regulations implemented under the Act of June 4, 1897, ch. 2, 30 Stat. 11, 35 (codified as amended in scattered sections of 16 U.S.C.) (Organic Administration Act).

In 1983, the Coastal Commission advised Granite Rock that the California Coastal Act, Cal.Pub.Res. Code §§ 30000–30900 (West 1977 & Supp.1985) (Coastal Act), required the company to obtain a state permit to continue its mining operations. The California legislature passed the Coastal Act in 1976 pursuant to the state's inherent police powers, as a reenactment of a 1972 initiative, and as an implementation of the federal Coastal Zone Management Act, 16 U.S.C. §§ 1451–1464 (CZMA), which encourages state regulation of coastal zones. Granite Rock brought this action for declaratory and injunctive relief to prevent the Coastal Commission from enforcing the state permit requirement. Because there were no factual issues in dispute, Granite Rock brought a motion for summary judgment challenging the state's legal authority to require the permit.

The district court denied Granite Rock's motion for summary judgment and then dismissed the action. *Granite Rock,* 590 F.Supp. at 1364, 1375. The court first reasoned that the land on which Granite Rock's claim was located did not fall within the CZMA's exclusion from the state's coastal zone. *Id.* at 1367–70. The district judge then concluded that the permit requirement was valid because states have concurrent legislative authority with Congress to regulate activities on federal lands within the coastal zone, the mining claim was not a federal enclave subject exclusively to federal regulation, and no federal statute or regulation preempted the state requirement. *Id.* at 1371–74. Granite Rock appeals.

II

The property clause of the Constitution states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Granite Rock argues that this is a grant of exclusive legislative power to Congress. It argues that states acquire power to regulate the use of federally owned property only if Congress expressly grants this power to them. Thus, because the federal government holds the title to the land in question, Granite Rock argues that California had no inherent police power to regulate the mining activity. The Coastal Commission concedes that the property clause grants Congress legislative power over federal lands, but it argues that the power is not exclusive—that states have concurrent legislative power to regulate the use of federal lands unless and until Congress affirmatively exercises its property clause power to preempt state regulation. We need not resolve this dispute over the proper interpretation of the property clause, however, if Congress has exercised its power to preempt the state's permit require-

ment. We, therefore, turn initially to that issue.

The Supreme Court recently articulated the test for federal preemption:

[S]tate law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted) (*Silkwood*).

Granite Rock argues that the state permit requirement is preempted either by the CZMA or by the Mining Act and certain Forest Service regulations promulgated under the Organic Administration Act. It contends that the CZMA preempts the state permit requirement because the CZMA evidences an intent on the part of Congress to reserve exclusively to itself the power to regulate the use of lands excluded from the coastal zone and because the CZMA excludes the land in question. Granite Rock argues that the Mining Act and Forest Service regulations preempt the permit requirement because the requirement stands as an obstacle to the accomplishment of the full purposes and objectives of the statute and regulations. It contends that the purpose of the Mining Act is to encourage mining and that the state permit requirement is an obstacle to accomplishing this purpose either because the state will prohibit mining altogether on the land in question or because it will condition a permit on unreasonable state environmental requirements.

The Coastal Commission argues that none of the federal law relied on by Granite Rock preempts the state permit requirement. It contends that the CZMA does not exclude the land in question from its coast-al zone and thus, instead of preempting the permit requirement, the CZMA actually authorizes it. The Coastal Commission argues that if a previous act of Congress could conceivably be read as preempting the permit requirement, the CZMA neutralizes its effect over land within the coastal zone. The Coastal Commission also argues that the Mining Act does not preempt state environmental regulation of federal lands unless the regulation prohibits mining altogether and that the question whether the Coastal Commission will refuse Granite Rock's permit application based on a per se policy of prohibiting mining at Pico Blanco is not yet ripe.

We need not decide whether the CZMA evidences a congressional intent to take exclusive power over regulating the use of any federal lands excluded from the coastal zone if the Coastal Commission's argument that the CZMA neutralizes the preemptive effect of other federal law over lands within the coastal zone is incorrect. Under these circumstances, the Mining Act and Forest Service regulations provide a narrower ground for us to decide the preemption issue in this case.

### A.

The legislative intent is clear on whether the CZMA neutralizes other federal law which might preempt the state. The Conference Committee stated that "[t]he Conferees ... adopted language which would make certain that there is no intent in this legislation to change Federal or state jurisdiction or rights in specified fields." Conf. Rep. No. 1544, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad. News 4776, 4822, 4824. This passage refers to section 307(e)(2) of the CZMA, 16 U.S.C. § 1456(e)(2), which states that "[n]othing in this chapter shall be construed ... as superseding, modifying, or repealing existing laws applicable to the various Federal agencies."

Similarly, the Senate Report demonstrates Congress's intent not to restore state authority within the coastal zone if a federal act otherwise preempts it over a

specific subject matter. In its statement of the CZMA's purpose, the Senate explained that the CZMA is merely a cooperative funding provision that "has as its main purpose the encouragement and assistance of States in preparing and implementing management programs to preserve, protect, develop and whenever possible restore the resources of the coastal zone of the United States." S.Rep. No. 753, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4776, 4776. The Senate indicated that the CZMA is designed to promote this purpose of "enhanc[ing] state authority," *id., reprinted in* 1972 U.S.Code Cong. & Ad.News at 4776, through the means of providing "Federal grants-in-aid to coastal states to develop coastal zone management programs [and] ... grants to help coastal states implement these management programs once approved." *Id., reprinted in* 1972 U.S.Code Cong. & Ad.News at 4776. *See also Secretary of the Interior v. California,* 464 U.S. 312, 104 S.Ct. 656, 659, 78 L.Ed.2d 496 (1984) (*Secretary of the Interior*). These grants were intended only to give coastal states an incentive "*to exercise their full authority* over the lands and waters in the coastal zone," 16 U.S.C. § 1451(h) (emphasis added), and not to restore authority that the states might previously have lost through federal preemption. *See* S.Rep. No. 753, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News at 4795 ("There are no changes in existing law resulting from this legislation.").

■ Thus, even if we assume that the land in question falls within the coastal zone, the legislative history and certain provisions of the CZMA conclusively demonstrate that Congress intended the CZMA *not* to change the status quo with respect to the allocation of state and federal power over lands within the coastal zone. Moreover, Congress gave no indication that it perceived the status quo as limiting its power over such lands. *Cf. Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 657–60, 102 S.Ct. 2071, 2078–80, 72 L.Ed.2d 398 (1982) (Congress's manifest perception of the status quo in subcontracting

claims found to be accurate). Therefore, we now consider the preemptive effect of Mining Act and Forest Service regulations.

### B.

■ The purpose of the Mining Act is to encourage mining on federal lands. *United States v. Weiss,* 642 F.2d 296, 299 (9th Cir.1981) (*Weiss*); *see also United States v. Goldfield Deep Mines Co.,* 644 F.2d 1307, 1309 (9th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). In 1970, Congress renewed its adherence to this policy, although it also declared its fidelity to the additional goal of lessening any adverse environmental impact from such mining. 30 U.S.C. § 21a. Then, in 1974, the Secretary of Agriculture promulgated regulations " 'to minimize adverse environmental impacts on National Forest System surface resources' that can be caused by mining, while, at the same time, not interfering with the rights conferred by the mining laws." *Weiss,* 642 F.2d at 297, *quoting* 36 C.F.R. § 252.1 (1975) (recodified at 36 C.F.R. § 228.1 (1984) ). *See generally* 36 C.F.R. pt. 228 (1984). These regulations require miners to notify the Forest Service of any mining related operation that is likely to "cause disturbance of surface resources." *Id.* § 228.4(a). "The initiation or continuation of such an operation is subject to the approval of the Forest Service." *Weiss,* 642 F.2d at 297. *See* 36 C.F.R. §§ 228.4–.5 (1984).

■ Although a general federal purpose to encourage a particular activity does not automatically preempt state environmental regulation that incidentally discourages the activity, *see, e.g., Silkwood,* 104 S.Ct. at 626; *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 220–23, 103 S.Ct. 1713, 1730–32, 75 L.Ed.2d 752 (1983) (*Pacific Gas*); *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 633, 101 S.Ct. 2946, 2961, 69 L.Ed.2d 884 (1981), we disagree with the Coastal Commission's converse argument that a state regulation which prohibits mining unless the miner

obtains a state permit automatically escapes preemption if issuance of the permit is conditioned only on reasonable requirements. In *First Iowa Hydro-Electric Cooperative v. Federal Power Commission*, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946) (*First Iowa*), the Supreme Court held that the Federal Power Act, which establishes a federal permit system authorizing the construction of hydroelectric dams, preempted a state law that prohibited such activity unless the petitioner first obtained a state permit. The Court reasoned that

> [t]o require the petitioner to secure the actual grant to it of a state permit ... as a condition precedent to securing a federal license for the same project under the Federal Power Act would vest in the Executive Council of Iowa a veto power over the federal project. Such a veto power easily could destroy the effectiveness of the Federal Act. It would subordinate to the control of the State the "comprehensive" planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government.

*Id.* at 164, 66 S.Ct. at 911–912 (footnote omitted). The Court applied the same reasoning in *Sperry v. Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), to hold that a federal patent regulation, which governed the issuance of federal permits allowing the preparation and prosecution of patent applications, preempted a state law that prohibited such activity unless a state permit to practice law was first obtained. *Id.* at 385, 83 S.Ct. at 1325. In neither case did the Court make a prohibition/regulation distinction and inquire into the reasonableness of the state's conditions for issuing or denying the permit. The additional permit system was preempted simply because it would undermine the federal permit authority.

We applied the same reasoning in *Ventura County v. Gulf Oil Corp.*, 601 F.2d 1080 (9th Cir.1979), *aff'd mem.*, 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980), to hold that the Mineral Lands Leasing Act of 1920, 30 U.S.C. §§ 181–263, preempted a county zoning ordinance that prohibited oil exploration and extraction activities on federal land unless a county permit was first obtained. 601 F.2d at 1084. We determined that there was an actual conflict between local and federal governments because "the Ventura authorities wish[ed] to regulate conduct which Congress has authorized." *Id.* We reasoned that the Departments of Interior and Agriculture had already issued federal permits, and thus "Ventura cannot prohibit that use, either temporarily or permanently, in an attempt to substitute its judgment for that of Congress." *Id.*

■ The Court has recognized that the *First Iowa* doctrine extends only to state permit mechanisms that actually intrude into the sphere of federal permit authority. Thus, in *Pacific Gas* the Court held that the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2282, did not automatically prevent California from prohibiting the construction of nuclear power plants unless a state permit was first obtained certifying that adequate storage facilities and means of disposal were available for nuclear waste. *See* 461 U.S. at 203–23, 103 S.Ct. at 1721–32. Although the Atomic Energy Act gives the Nuclear Regulatory Commission the authority to issue building permits if the construction and operation of a given nuclear power plant would be safe, the Court found that the specific state permit requirement addressed only economic and not safety concerns. *See id.* at 217–20, 103 S.Ct. at 1729–30. The Court expressly rejected the argument that states may prohibit new construction of nuclear power plants "until [their] safety concerns are satisfied by the Federal Government." *Id.* at 212, 103 S.Ct. at 1726. Thus, because the Atomic Energy Act does not give the Nuclear Regulatory Commission "comprehensive planning responsibility" beyond safety and into economic planning and because the state provision "d[id] not interfere with the type of plant that could be constructed," the Court held that the *First Iowa* doctrine did not apply. *Id.* at 223 n. 34, 103 S.Ct. at 1732 n. 34.

In deciding whether the *First Iowa* doctrine applies in this case, we must determine whether federal law establishes authority in a federal agency to prohibit or permit mining in national forests conditioned on meeting environmental protection standards and, if so, whether the state permit authority exercised in this case intrudes into that sphere of authority. We conclude that Forest Service regulations mandate that the power to prohibit the initiation or continuation of mining in national forests for failure to abide by applicable environmental requirements lies with the Forest Service. 36 C.F.R. §§ 228.4–.5 (1984). We find unpersuasive the argument that the Mining Act and these regulations do no more than encourage mining subject to minimum federal environmental regulation, leaving the states free to condition the ability to mine on adhering to more stringent requirements. *See, e.g., State ex rel. Andrus v. Click,* 97 Idaho 791, 796, 554 P.2d 969, 974 (1976). On the other hand, we do not believe they go so far as to occupy the field of establishing environmental standards, striking a federally determined balance between encouraging mining and protecting the environment in national forests. The Forest Service regulations recognize that a state may enact environmental regulations in addition to those established by federal agencies. *See* 36 C.F.R. § 228.8 (1984); *see also* 16 U.S.C. § 551a. Moreover, a state may urge the Forest Service to withhold or revoke a federal mining permit from a miner who does not abide by all applicable state and federal standards. But an independent state permit system to enforce state environmental standards would undermine the Forest Service's own permit authority and thus is preempted.

Our conclusion is bolstered by the fact that even the Forest Service is limited in the amount of regulation it may impose as a condition of mining in national forests because of the federal policy to encourage mining on federal lands. *See Weiss,* 642 F.2d at 299; *see also* 30 U.S.C. § 21a; 36 C.F.R. § 228.5(a) (1984). To allow a second tier of permit authority to be exercised by the states would undermine the Forest Service's ability to keep the applicable environmental requirements within the range of reasonableness. *See Weiss,* 642 F.2d at 299; 36 C.F.R. § 228.5(a) (1984). Current federal law allows the states to establish environmental standards that the Forest Service will apply in exercising its permit authority. *See id.* § 228.8. But by reserving final permit authority in the Forest Service, *see id.* §§ 228.4–.5, it also affords the Forest Service the power necessary to promote the federal purpose of maintaining the reasonableness of the overall regulatory mix. *See* 30 U.S.C. § 21a; 36 C.F.R. § 228.5(a) (1984).

Our conclusion is not affected by the fact that the Forest Service staff stated in its environmental assessment of Granite Rock's plan of operation that "Granite Rock is responsible for obtaining any necessary permits which may be required by the California Coastal Commission." *Granite Rock,* 590 F.Supp. at 1374. A routine staff statement cannot change the effect of the formally adopted regulations.

REVERSED.